**SUDOUEST IMPORT SALES CORPORATION, Plaintiff, Appellant,**

v.

**UNION CARBIDE CORPORATION, Defendant, Appellee.**

**No. 83–1725.**

United States Court of Appeals, First Circuit.

Argued Feb. 9, 1984.

Decided April 12, 1984.

Philip E. Roberts, Hato Rey, P.R., with whom Harry A. Ezratty, San Juan, P.R., was on brief, for plaintiff, appellant.

Samuel T. Cespedes, with whom Maggie Correa-Aviles, and McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, San Juan, P.R., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Union Carbide Corporation cancelled a contract that had made Sudouest Import Sales Corporation its "sales representative" in Puerto Rico. Sudouest sued Union Carbide, alleging that the cancellation violated the Puerto Rico Dealer's Act, 10 L.P. R.A. § 278 *et seq.* (commonly known as Act 75). The federal district court, 569 F.Supp. 1547, found that Sudouest was not a dealer within the terms of that Act; it granted summary judgment for Union Carbide; and Sudouest appeals. Sudouest believes there are "genuine" and "material" issues of fact in dispute on the dealership question. Fed. R.Civ.P. 56. The factual disputes to which Sudouest points are "material" only if its version of the facts makes it a dealer under the Act. *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1204 (1st Cir.1983). We have examined its factual account, mostly contained in an affidavit of its president; we conclude that Act 75 does not apply.

Our conclusion rests upon three salient features of Sudouest's account of its Union Carbide relationship. First, many of the ordinary trappings of a dealership are not to be found. Sudouest did not handle Union Carbide's product, Kemet (an electrical capacitor). It did not ship Kemet; it did not deliver Kemet; it did not store Kemet. Rather, Union Carbide shipped Kemet directly to the customer when it received an order. Moreover, Union Carbide, not Sudouest, handled billing and receipts. Sudouest did not bill the customer, take its money, or assume any credit risk.

Second, while Sudouest 'sold' Kemet to customers in Puerto Rico, its sales activities were limited. Union Carbide had previously signed a "national" sales contract with each of Sudouest's customers (or with a customer's parent corporation). The "national" sales contract determined virtually all conditions of any Kemet sale, including price. The contract left open the amount, if any, the customer would order. Sudouest's job was 1) to visit these customers in Puerto Rico, 2) to convince them to order Kemet from Union Carbide, rather than to use a competitor's product, and 3) to send any resulting purchase orders to Union Carbide.

Third, while Sudouest engaged in some promotional activities, their scope was also limited. It sent a newsletter to Kemet customers in which it referred to Kemet and to other products that Sudouest carried. It made certain that Sudouest's and Kemet's names were mentioned in a widely circulated publication of Puerto Rico's Economical Development Administration. It sent three employees to learn how Kemet was made. It visited customers each month and gave them literature. One salesman devoted most of his time to

---

* Of the Fifth Circuit, sitting by designation.

the needs of Sudouest's largest Kemet customer. It displayed a Kemet banner at a trade show. Sometimes it entertained potential buyers.

■ The legal question before us is whether the "relationship" just described between Sudouest and Union Carbide is a 'dealership' arrangement within the terms of the Act. The Act describes the relevant relationship as one in which the "dealer" "effectively ... [takes] charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." 10 L.P. R.A. § 278. The Supreme Court of the Commonwealth has emphasized that this statutory language must be "delimited in the light of the ends sought by the statute." *San Juan Mercantile Co. v. Canadian Transport Co., Ltd.,* 108 D.P.R. 211, 215 (1978). And the statute is aimed at the "abusive practices of manufacturers who arbitrarily eliminated dealers as soon as *they created a favorable market for their products and services." Id.* at 216 (emphasis added); *see also* Statement of Motives of Act 75, 1964 P.R. Laws, 4th Reg. Sess. 231 (problem is one of enterprises eliminating dealers "as soon as they have created a favorable market"). In light of this purpose, the Commonwealth Supreme Court has said that a dealer protected by Act 75 is "one who endeavors *to create a market or get new clients* for a product or service by promoting or closing sales contracts." *San Juan Mercantile Co. v. Canadian Transport Co.,* 108 D.P.R. at 217 (emphasis added). Thus, where a plaintiff has invested time, effort and expense in the *development* of a market, the Commonwealth courts have applied the Act, even where certain other trappings of the typical dealership were missing. *See, e.g., Cordova & Simonpietri Insurance Agency v. Crown American Insurance Company of Canada,* 112 D.P.R. 797 (1982) (agent and representative in Puerto Rico of foreign insurance company, whose job included enlarging the market and getting new clients for principal, was dealer protected by Act 75). Where, however, the plaintiff essentially serviced clients developed by others,

where it did not add customers or enlarge the market, and where other significant trappings of a dealership were missing, Act 75 has been held not to apply, even though the plaintiff sells the product to existing customers. *Colon v. Ideal Security Hardware Corp.,* No. 78–1607 (P.R.Superior Ct. Sept. 29, 1981) (plaintiff, who did not maintain an inventory, did not fix prices, did not invoice customers or deliver products, serviced and sold to two customers previously developed by defendant and did not add customers or enlarge market, was not protected by Act 75).

■ In our view, this case is far closer to *Ideal Security* than to the cases in which a dealership relation has been found. A reading of the affidavit favorable to Sudouest reveals a relation in which Union Carbide "pre-sells" the customer or its parent on the merits of Kemet to the point where all of the many terms of sale are determined. Sudouest but takes the final step in the process of securing the order. There is no indication that Sudouest has found new clients. It is difficult, then, to see how one could characterize its activity as "developing" or "enlarging" the market or attempting to do so. And there are no other trappings of dealership that make up for this omission. Thus, in light of the Act's purposes and the Commonwealth cases interpreting the Act, Sudouest falls outside its scope.

The fact that the district court, familiar with Commonwealth law, reached the same conclusions, offers us additional assurance that we have interpreted Commonwealth law correctly. *Bishop v. Wood,* 426 U.S. 341, 345–46, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976); *Gual Morales v. Hernandez Vega,* 604 F.2d 730, 732 (1st Cir. 1979). Appellant argues that the district court erred in finding that Sudouest did not "close sales contracts" for Kemet. But any error on this point is insufficient to change the results. The issue as to whether Sudouest 'closed' the contracts amounts to a narrow legal question. Did the 'national' sales contract make of the custom-

er's purchase order an "offer" that Union Carbide could reject? If so, Union Carbide, not Sudouest, 'closed' the bargain. Or did the 'national' contract itself amount to an "offer" which the customer's purchase order "accepted?" If so, Sudouest 'closed' the contract. This point of contract law, however, has little to do with the underlying business realities of the Sudouest/Union Carbide relation. We have assumed its answer in Sudouest's favor. But, even so, —even if Sudouest made the final sale—the facts do not show sufficient "endeavors to create a market or to get new clients," *San Juan Mercantile Co. v. Canadian Transport Co.*, 108 D.P.R. at 217, as to bring Sudouest within the Act.

The judgment of the district court is *Affirmed.*