EBI, INC., et al., Plaintiffs, Appellants,

v.

GATOR INDUSTRIES, INC.,
Defendant, Appellee.

No. 86–1514.

United States Court of Appeals,
First Circuit.

Dec. 10, 1986.

Hector G. Oliveras, Hato Rey, P.R., for plaintiffs, appellants.

Arnaldo Velez with whom David Efron and Taylor, Brion, Buker & Greene, Miami, Fla., were on brief, for defendant, appellee.

Before COFFIN, Circuit Judge, TIM-BERS,* Senior Circuit Judge, and BOWNES, Circuit Judge.

COFFIN, Circuit Judge.

This is an appeal from a summary judgment for defendant Florida shoe manufacturer, Gator Industries, Inc., in a diversity suit removed to the federal district court for Puerto Rico invoking the Puerto Rico Dealer's Contracts Act, Act No. 75 of June 29, 1964 (P.R. Laws Ann. tit. 10, § 278 *et seq.*). 629 F.Supp. 662. Plaintiffs are its former sales representatives whose agency had been terminated, allegedly without just cause, in 1983.[1]

There are three issues: (1) whether the district court properly issued summary judgment on this record that plaintiffs were not, as a matter of law, "dealers"

---

* Of the Second Circuit, sitting by designation.

1. Plaintiffs include two brothers, Gustavo and Juan Bermudo Azor, and two corporations in which they are stockholders, Empresas Bermu-

do, Inc., and Representaciones EBI, Inc. The result reached by both the district court and ourselves makes it unnecessary to determine which of the plaintiffs should recover.

under the Act; (2) whether there was an alternative cause of action for breach of contract and, if so, whether it was properly dismissed, along with the Law 75 action; and (3) whether the court abused its discretion in imposing sanctions against counsel for plaintiffs for filing a motion for reconsideration. We affirm on all issues.

### Law 75—Are Plaintiffs a "Dealer"?

#### 1. The Facts

The facts, developed through admissions, stipulations, exhibits, and deposition, are as follows. Gator is a Florida corporation engaged in the manufacture and sale of low-priced, unbranded tennis shoes and sneakers. From 1977 to 1983 plaintiffs represented Gator in Puerto Rico in servicing prior retail customers and procuring new ones.

The marketing and distribution system was the following. The only formal promotional exercise was Gator's twice-a-year participation in stateside shoe shows. After the shows, plaintiffs would visit present and prospective customers in Puerto Rico. If the customer decided to place an order, plaintiffs would fill out an order form, in their own handwriting, listing the items, quantities, prices, purchaser, and purchaser's shipping instructions.[2] Plaintiffs would forward the order to Gator in Florida, where the information was taken off the form and readied for the computer. The order would be presented for a credit check to Gator's factor, which would finance the sale on credit and receive payments directly from the buyer.

An "Acknowledgement" form with all the details of the order typed in, including estimated shipment date, would be sent to the buyer with the instruction "PLEASE NOTE TERMS, CONDITIONS AND SHIPPING DATES. NOTIFY US BY MAIL IF THERE ARE ANY DISCREPANCIES." The reverse side of the form was filled with 14 conditions of sale, the first two of which were that the "conditions of sale together with order and acceptance by the seller constitute the only contract between buyer and seller" and that all orders were subject to seller's approval, the seller also reserving the right to cancel an order at any time for any reason.

Under this arrangement, plaintiffs maintained no inventories, had no investment in warehouse or other facilities, had no responsibility for shipment or delivery, engaged in no advertising or formal promotion, and assumed no credit risk. During the period of nearly six years of plaintiffs' representation of Gator, Gator's sales record in Puerto Rico increased from 5 customers and $100,000 in 1976 (the year before appellants began their representation) to 19 customers and $1,136,365 in 1983. Their commissions during the period totalled $61,232.63, an average of about $11,000 a year.

The district court, stressing the seller's reservations in the "conditions of sale" provisions contained in Gator's acknowledgement form, held that although plaintiffs' activities resulted in increased sales of Gator's products in Puerto Rico,

> [p]laintiffs did not demonstrate that they possessed that "independent entrepreneur, devoid of hierarchial subordination" quality in their relationship with defendant [citation omitted] that enabled them to be "effectively in charge" of the distributorship by closing the sales they promoted. What the record has established is that plaintiffs were only forwarders of orders they solicited on behalf of defendant and for which they received a commission upon actual sales. We consider that the Supreme Court of Puerto Rico's conceptualization of a Law 75 dealer prevents us from including such type of relationship as one protected by this special law.

#### 2. The Law

The statute contains two very similar definitions of the words "dealer" and "deal-

---

**2.** Although plaintiffs have stated in their briefs and motion for reconsideration, that the purchaser's signature was obtained on the order form, we have found no evidence of any such signature.

er's contract." A "dealer" is one "interested in a dealer's contract" because of having "effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R.Laws Ann. tit. 10, § 278(a). The term "dealer's contract" expands somewhat on this definition by stating that it is a relationship in which a dealer "effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico." P.R.Laws Ann. tit. 10, § 278(b). In other words, section 278(b) makes somewhat more clear than does section 278(a) that the "taking charge" of distribution be in the form of "concession or franchise."

This to us implies somewhat more of a grant of authority to a Law 75 "dealer" than that merely to take orders and forward them to the home office for approval. It is true, as plaintiffs have argued, that the legislative history, as evidenced by a joint committee report, describes the law's objective very broadly: to attack the problem created by the elimination, without just cause, of "distributors, concessionaries or agents, as soon as they have created a favorable market." Journal of Sessions of the Legislative Assembly of the Commonwealth of Puerto Rico, Vol. 18, Part 4, May 22, 1969, (House), p. 1724. But however expansive the intent, we doubt' that the words of the statute can fairly be read to include route or area salesmen who, without making any investment or commitment or taking any risk other than the value of their own time, are permitted to take orders and are paid commissions on orders finally accepted by the principal.

Any such speculation on our part is far less important than the interpretations given Law 75 by the Supreme Court of Puerto Rico. We consider a trilogy: *J. Soler Motors, Inc. v. Kaiser Jeep International Corp.*, 8 P.R. Supreme Court Official Translations 138, 108 D.P.R. 134 (1978); *San Juan Mercantile Corp. v. Canadian Transport Co.*, 8 P.R. Supreme Court Official Translations 218, 108 D.P.R. 134 (1978); and *Cordova & Simonpietri Insurance Agency v. Crown American Insurance Co.*, 12 P.R. Supreme Court Official Translations 1003, 112 D.P.R. 197 (1982).

In *J. Soler Motors, Inc.*, the plaintiff was an automobile agency that purchased directly from the manufacturer and had been granted the franchise to sell Jeep products in the Bayamon area. The court referred to the relationship between the plaintiff and the manufacturer as one of "continuity, stability, mutual trust. coordination between parties as independent entrepreneurs, devoid of hierachical subordination, and in whom [plaintiff] has made a substantial investment." 8 P.R. Supreme Court Official Translations at 145. Plaintiffs in the case at bar, even if they meet the first four characteristics, would not seem to meet the latter two, i.e., the absence of hierachical subordination and, certainly, the making of a substantial investment.

The companion case, *San Juan Mercantile Corp.*, involved the question whether a local stevedore, a "husbandry agency," was a "dealer." The court fleshed out what it deemed the "very sketchy definitions" in the statute by saying:

> The dealer is basically characterized by his endeavors to create a favorable market and to draw customers to a product or service by promoting and closing sales contracts. His work generally includes the activities necessary for the transportation of the products or services he represents from the manufacturer to the consumer or to some point in between. *Cf. J. Soler Motors Corp. v. Kaiser Jeep International Corp., supra.* Publicity, market coordination, merchandise deliveries, collections, the keeping of an inventory, and mainly the promotion and closing of sales contracts are, in general terms, obligations of the dealer.

8 P.R. Supreme Court Official Translations at 220.[3] Plaintiffs' efforts here include

---

**3.** To clear up any possible confusion, we point out that our quotation of this same language in

*Sudouest Import Sales Corp. v. Union Carbide Corp.*, 732 F.2d 14, 16 (1st Cir.1984), contains a

only one out of eight activities, that of promoting sales contracts. To be sure, "promotion and closing of sales contracts" were highlighted, but "closing" must mean something more than a facilitating step toward, but short of, finality. Otherwise, the two terms would be telescoped into any effort advancing the final sale of goods and services.

If there were doubt as to the criticality of a dealer's power to bring a sales contract to completion, it is removed by the third case in the trilogy, *Cordova & Simonpietri Insurance Agency.* There the court dealt with a contract with an insurance agency. After quoting the language which we have quoted from *San Juan Mercantile Corp.* about "promoting and closing," the court focused on a provision of the insurance code that defined an insurance agent as one who was appointed not merely to solicit and negotiate but, if so authorized, "to effectuate and countersign insurance contracts." 12 P.R. Supreme Court Official Translations at 1010. The court added, "The insurance agent's principal function, then, is to sell insurance policies; that is to say, to promote and close insurance contracts...." *Id.* It went on to quote a treatise to the effect that insurance agents' "typical function is to promote ... the closing of contracts in behalf of their principal, or of closing them in their own behalf and on their own account." *Id.,* quoting Rodrigo Uria, *Derecho Mercantil,* sec. 581 (11th ed. 1976).

Plaintiffs look upon the acknowledgement form as simply a rewriting of the order. They cite a deposition statement of one Miranda, a Gator official, that "the buyer must read that acknowledgement and if there is any discrepancy of what he asked for, he must let us know," and conclude that this is the *only* purpose of the acknowledgement. We see no such implied negativing of the plain instruction on the face of the acknowledgement form that the buyer must give notice of any discrepancy

on any of the "terms, conditions, and shipping dates." Nor do plaintiffs persuade us that the entire reverse side of the acknowledgement form containing the fourteen conditions of sale is meaningless. The mere fact (if it were a fact) that often, if not most of the time, the final contract replicated the terms of the original order could in no way whittle down the complete reservation of right to approve contained in the conditions of sale.

■ Under the circumstances of this case we see no genuine issue of material fact remaining. *Hahn v. Sargent,* 523 F.2d 461 (1st Cir.1975). Where, as here, a sales representative makes no investment in promotion, inventories, or facilities; has no responsibilities for credit, collections, shipment or deliveries; and, in addition, has no power to determine whether a given buyer has bound the principal to sell certain goods under certain terms and conditions, we conclude that the sales representative has not risen to the status of "dealer" under Law 75, as the Supreme Court of Puerto Rico has interpreted that law. For consistent federal court decisions, *see Sudouest Import Sales Corp. v. Union Carbide Corp.,* 732 F.2d 14 (1st Cir.1984); *Gonzalez v. Brown Group, Inc.,* 628 F.Supp. 436 (D.P.R.1985); *Mario R. Franceschini, Inc. v. Riley Co.,* 591 F.Supp. 414 (D.P.R.1984). Were we to hold the contrary, we would be going beyond any authority, Commonwealth or federal, of which we are aware.

### The Breach of Contract Claim

Plaintiffs, by a motion to reconsider after the entry of summary judgment against them, protest the dismissal of a separate claim for breach of contract. Such a claim was gossamer to begin with. Plaintiffs' original complaint, to be sure, bore the caption on the title page, "1) Violation of Law 75 of June, 1964 2) Breach of Contractual Obligations." The first entry in the docket also labelled the action "breach of

typographical error. The language of *San Juan Mercantile Corp.,* correctly reproduced above, defines a dealer as one who creates a market by

"promoting *and* closing sales contracts." (Emphasis added.)

contract." The allegations of the 1983 complaint, however, merely averred the existence of a sales agency (without specifying any terms), plaintiff's efforts and success in developing a market, termination without just cause, and damages. An amended complaint seven months later, in March, 1984, was filed in order to permit the addition of a corporation, Empresas Bermudo, Inc., and the brothers Bermudo Azor as parties plaintiff. This amended complaint also carried the dual caption of the original complaint, repeated the same allegations, and added that Gator must respond to the damages not only "according to law" (as in the original complaint) but also "and breach of contract."

Six months later the court and the parties agreed to a pretrial order. The action was described as "an action for damages." Twenty-five stipulations of fact were set forth concerning the sales of Gator in Puerto Rico, what plaintiffs and Gator did or did not do with respect to the Puerto Rico selling operation, and the fact that the relationship was terminated. Again, no specific term or condition of the oral agreement between the parties, or breach thereof, was identified. Seventeen issues were listed, beginning with the Law 75 dealership issue, then including standing of the various plaintiffs, novation (affecting the corporate plaintiffs), statute of limitations, just cause, estoppel, and concluding with the questions, "Should the benefit of Law 75 apply to plaintiffs ... ? What amount should be awarded ... ?"

Finally, plaintiffs' opposition to Gator's motion for summary judgment stated that "[t]he real issue to be adjudiciated at this time ... is whether or not the plaintiffs qualify as 'Dealers' under Law 75.... Should the judgment be in favor of the applicability of Law 75, then evidence should be passed upon on the issues of 'how much and to whom' shall compensation be granted, ... provided just cause for termination is not present on the basis of any evidence presented."

■ On this record we cannot fault the district court for characterizing plaintiffs' breach of contract argument as "an eleventh hour attempt to reconstruct their claim." The labels on the two complaints were totally unsupported by any factual allegations which would signal a claim separate from the Law 75 action. And nothing in the detailed pretrial order signalled any issue of fact or law other than one relevant to the Law 75 issue. Moreover, as the district court noted, nowhere do plaintiffs intimate "that plaintiffs' arrangement with defendant had a specific time period or limitations on termination so as to enable them to derive contractual rights ... other than those afforded by the special protections of Law 75." Finally, had there existed a basis for asserting another claim, requiring a trial to determine liability, we doubt very much that the court would have invested its time in considering summary judgment motions that did not have the potential of ending the case.

### The Sanction

Plaintiffs filed a motion for reconsideration based on two grounds: (1) that the court erred in dismissing the entire complaint, since an action for breach of contract remains a "genuine cause of action"; and (2) that deposition testimony of Gator's official Miranda established "the true trivial significance of the 'acknowledgement' form" but that, if not, evidence must be taken as "there is a genuine issue as to a material fact."

The court, in a written order responding to the motion, reiterated its conclusion that all the evidence, including the deposition testimony, pointed only to plaintiffs being "forwarders of orders," not dealers. It further noted that plaintiffs had never asserted the existence of any factual issue, having themselves moved for summary judgment. More particularly, the court observed that plaintiffs never complied with Local Rule 311.12 by filing, in opposition to Gator's motion for summary judgment, a statement of any genuine issues of material fact. As to the breach of contract ground, the court analyzed the pleadings, the pretrial order, and the evidence and

concluded that the claim had never been properly presented. It found the motion frivolous and assessed costs and attorney's fees of $250 against counsel under 28 U.S.C. § 1927 and Fed.R.Civ.P. 11.

■ Our standard of review, of course, permits us to look only for abuse of discretion. We recognize that although most motions for reconsideration ultimately prove unavailing and that many may indeed have little merit, courts should be slow to sanction such efforts if based on reasonably arguable grounds. In this case we would say that the legal issue, whether plaintiffs' successful marketing efforts plus the taking and forwarding of orders (that were, perhaps, honored and accepted in most cases) were sufficient to make them "dealers," was reasonably arguable. But plaintiffs did not make this point in their motion for reconsideration; rather, they argued that deposition testimony so overcame the obvious meaning of the acknowledgement form that the latter had no significance and that at least there was a question of fact. The first proposition is frivolous and the second had been abandoned by plaintiffs' failure to comply with the local rule requiring issues of disputed fact to be timely identified.

We have already indicated our view of the attempted vivification—we do not say revival—of the breach of contract claim. The docket entries in this case are many and show a wide variety of activity over two and a half years by both court and counsel. To come forward at the end of such a case and attempt to assert a cause of action which had never been supported by factual allegations or by evidence and which had been effectively foreclosed by the pretrial order and the unprotesting participation of both sides in seeking resolution through summary judgment is irresponsible.

The court was well within its discretion in imposing sanctions.

*Affirmed.*