**LINEAS AEREAS COSTARRICENSES, S.A., Plaintiff,**

**v.**

**CARIBBEAN GENERAL, INC., Defendant.**

**Civ. Nos. 87–857 HL, 87–881 HL.**

United States District Court, D. Puerto Rico.

Jan. 8, 1988.

Carlos R. Ríos, Rafael González Vélez, Hato Rey, P.R., for plaintiff.

Federico Ramírez Rios, San Juan, P.R., Federico Ramirez Ross, Santurce, P.R., for defendant.

## OPINION AND ORDER

LAFFITTE, District Judge.

On July 7, 1987, two lawsuits were commenced by the same parties in two different jurisdictions involving the same controversy. In Puerto Rico Superior Court, San Juan Part, Caribbean General, Inc. ("Caribbean"), a domestic corporation, filed a complaint under Puerto Rico Dealers' Act, 10 L.P.R.A. sect. 278 *et seq.* ("Law 75") against Líneas Aéreas Costarricenses, S.A. ("LACSA"), a Costa Rican airline company. Caribbean alleges that it entered into a dealership contract with LACSA, called the General Sales Agent Agreement, which LACSA unlawfully terminated in violation of Law 75. Caribbean seeks indemnification, an accounting, specific performance, or, in the alternative, damages under Law 75. Caribbean also moved for temporary *pendente lite* relief pursuant to Article 3A of the Dealers' Act, 10 L.P.R.A. sect. 278b-1 to maintain and keep in effect the alleged dealership relationship. Simultaneously, LACSA filed a complaint in federal district court seeking return of property, a declaration that Law 75 is not applicable to the contract and an order compelling arbitration as per the arbitration clause. If Law 75 does apply to the contract then a declaration that LACSA had just cause to terminate the contract. LACSA argues that it had just cause to terminate the contract because Caribbean did not utilize its best efforts to promote the sale of LACSA's services and distribute the promotional material to the travel agents and the general public. LACSA also contends that Caribbean misled the public, travel agencies and other airlines representing to be LACSA's regional manager. Subsequently, LACSA requested a temporary restraining order.

On July 13, 1987, LACSA removed the case from the Commonwealth Superior Court to this Court pursuant to 28 U.S.C. sect. 1441 and sect. 1332. Both cases were consolidated, and a consolidated hearing regarding the requests for preliminary and permanent injunction was held on July 23, August 14, and August 19, 1987. After the last hearing, the parties were ordered to file simultaneous briefs.

Before the Court are the issues of whether or not: 1) to grant LACSA's request to restrain Caribbean from issuing LACSA tickets and freight stubs for air travel and to order Caribbean to return these stubs and other valuable documents to LACSA; or 2) to grant Caribbean's request to maintain the status quo and continue the dealer-

ship relationship during the pendency of this suit. This Court must also decide whether or not to send this dispute to arbitration. We find that the General Sales Agent Agreement is a dealership contract protected under Law 75. We deny both parties' request for injunctive relief and order the parties to pursue their dispute via arbitration.

FACTS

Edwin Ramos Yordán and his wife, Virginia Seda de Ramos, owned and operated a travel agency called Agencia Seven Travel located in Hato Rey, Puerto Rico. They later sold the travel agency and formed Caribbean General, Inc. In 1982, LACSA did not have scheduled flights to Puerto Rico but it conducted sales in Puerto Rico in connection with its worldwide airline services. The sales made in Puerto Rico in 1980 and in 1981 amounted to $335,000 and $380,000 respectively. LACSA was interested in increasing the Puerto Rico market which led them to designate Caribbean as its general sales agent for passenger and cargo sales in Puerto Rico in February 1982. (Defendant's Exhibit M.) The obligations and duties of Caribbean were described in a detailed letter dated February 2, 1982 from LACSA's Director of Sales to Ramos Yordán, Caribbean's president and stockholder. (Defendant's Exhibit B.) The letter stated that Caribbean had to establish an adequate office and had responsibilities in sales and in marketing.[1] Caribbean established its office in Hato Rey in the same building where Agencia Seven Travel was located and then subsequently moved to Santurce. They remodeled the office at their own expense.[2]

On September 23, 1983, a new contract—General Sales Agent Agreement—was signed between the parties (Joint Exhibit I). The contract described the relationship as a commercial endeavor and not as an employment relationship. (Preamble and paragraph 2 of "Additional Clauses to the Contract....") Basically, Caribbean would represent LACSA in the sale of air tickets and air freight stubs along with promoting LACSA services. The contract stated the responsibilities, duties and liabilities of Caribbean. Briefly, these obligations were:

1) Caribbean would employ personnel for his own account without LACSA assuming any liability for such personnel. (Paragraph 3 of "Additional Clauses.")

2) Caribbean shall be responsible for the acquisition of all the licenses, permits and authorizations which are required by law at its own expense. (Paragraph 4 of "Additional Clauses.")

3) Caribbean would be responsible for losses incurred as a result of bankruptcy or insolvency of a purchaser and any damages or losses caused in relation to travel documents. (Paragraph 11(b).)

4) Caribbean could also grant credit to companies and third parties for freight service at its discretion. (Paragraph 2 of Annex E.)

5) Caribbean had to facilitate better relations between LACSA and government agencies, private organizations, the press and the general public. (Paragraph 19(b).)

6) Caribbean shall select and appoint sales agents that were approved by IATA and make an accounting to LACSA regarding these agencies. (Paragraph 19(e).)

7) At its own expense, Caribbean would conduct special types of publicity campaigns recommended by LACSA. (Paragraph 19(L).)

---

**1.** See Appendix. Caribbean alleges that the General Sales Agreement retained the same duties and obligations that it had under the original contract and in addition assumed functions related to the new scheduled airline service, such as the handling of reservations, baggages and flight meals, and processing of claims. LACSA claims that the parties' rights are controlled by the new contract.

**2.** The parties disagree on the actual amount of investment made by Caribbean. The cost of remodeling and furniture according to Caribbean was approximately $23,000 (Defendant's Exhibit N–1). On cross examination of Ramos Yordán, LACSA confronted Ramos Yordán with a financial statement for 1983 which showed an $8,000 expenditure and investment for said remodeling (Plaintiff's Exhibit 5).

8) Caribbean had to ensure that cargo reached its destination. (Paragraph 19(k).)

9) Caribbean was responsible for communication expenses. (Paragraph 7.)

In consideration for Caribbean's efforts, LACSA would pay a monthly subsidy and commission for sales made either by Caribbean or IATA organizations. Originally, the monthly subsidy for administrative costs was $5,000 and then increased to $8,000 on August 1, 1984. For the sale of tickets, Caribbean received 13% commission on direct sales made by Caribbean and 5% on indirect sales (sales made through travel agencies or other intermediaries). For freight sales, the commission was 8% on direct sales and 3% on indirect sales.

The contract also contained two arbitration clauses naming two different arbitrators. LACSA reserved in the contract the right to name a delegate and establish its own office in Puerto Rico, and to eliminate the Caribbean's office by giving prior written notice. LACSA retained ownership of tickets, freight stubs and other travel documents which were to be used by Caribbean.

Although Caribbean had the financial responsibilities and the duties to promote LACSA under the contract, in reality, LACSA financed all publicity and promotion such as providing the literature, postage and stationery. LACSA also paid for the telephone and communication expenses incurred by Caribbean although it was the latter's responsibility.

After the signing of the contract, Ramos Yordán and his wife allegedly disposed of Agencia Seven Travel as per the request of LACSA. LACSA initiated regularly scheduled flights to and from San Juan, Puerto Rico. Caribbean had seven employees and the current monthly subsidy of $8,000 covered 71% of Caribbean's operational non-reimbursable expenses, excluding depreciation. Thus, Caribbean was responsible for 29% of operational expenses.

In March of 1987, LACSA allegedly discontinued the subsidy and transferred the reservations department to Miami. On March 15, 1987, LACSA named a delegate to Puerto Rico to open bank accounts, register as LACSA's representative and establish contacts with Ports Authority. Later, the delegate became the Regional Manager. (Hearing Tr. of July 17, 1987, pages 56–58.) On June 29, 1987, LACSA cancelled the General Sales Agent Agreement. On July 2, 1987, LACSA tried to recover from Caribbean computer terminals, airplane and freight tickets and other documents, but Caribbean refused. The parties have been unable to settle this dispute.

CONTENTIONS

Caribbean argues that this contract is a dealership contract protected under Law 75 and it is entitled to provisional remedies. It contends that LACSA performed acts detrimental to the established relationship and terminated the contract without just cause as required by Law 75. In March, LACSA discontinued the payment of $8,000 monthly compensation, transferred the reservation department to Miami and sent delegates to Puerto Rico assuming a substantial portion of Caribbean's responsibilities. It urges the Court to maintain the "status quo" and provide for the continuation of the relationship.

On the other hand, LACSA claims that Caribbean is not entitled to provisional remedies because Law 75 is not applicable to their relationship. LACSA urges an order requiring Caribbean to turn over ticket stubs and freight stubs, which can be issued for travel in any airline, including LACSA, to any destination in the world. LACSA further argues that it runs the risk of losing substantial amount of money and suffer irreparable damage to its good name and reputation.

Before determining whether to grant or to deny provisional remedies under Article 3A, we must determine whether Caribbean's activities as a general sales agent for LACSA constitute a dealership under Law 75 and within the protection of the Act. If the General Sales Agreement is not a dealer's contract then Caribbean would not be entitled to provisional remedies under Law 75. If there is a dealership contract, the Court, however, must consider the public

policy of Law 75 and the interest of the parties.

LAW 75

Law 75 prohibits the unilateral termination of a "dealer" without "just cause." The Act was enacted to remedy the exploitative practices of certain principals who arbitrarily eliminated their dealers soon after they had invested in the business to create and to build a favorable market for their principals. WARNER LAMBERT v. TRIBUNAL SUPERIOR, 101 D.P.R. 378, 101 P.R.R. 527 (1973).

The definitions provided in the Act for a dealer and dealer's contract are "very sketchy." *San Juan Mercantile Corp. v. Canadian Transport CO., LTD.*, 108 D.P.R. 211, 108 P.R.R. 218,220 (1978). A dealer is defined as a "person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." 10 L.P.R.A. sect. 278. The dealer's contract is a:

> relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

Three decisions of the Puerto Rico Supreme Court have provided guidance in determining which contractual relationships are protected under the Act. The trilogy are: *J. Soler Motors, INC. v. Kaiser Jeep Int'l. Corp.*, 108 D.P.R. 134, 108 P.R.R. 218 (1978); *San Juan Mercantile Corp. v. Canadian Transport*, 108 D.P.R. 211, 108 P.R.R. 218 (1978); CORDOVA & SIMONPIETRI INS. AGENCY v. CROWN AMERICAN INS. CO., 112 D.P.R. 197, 112 P.R.R. 1003 (1982).

In J. SOLER MOTORS, INC., the court described a dealer as an "independent entrepreneur, devoid of hierarchical subordination, and in whom has made a substantial investment (in the business)." 108 P.R.R. at 145. The court found that plaintiff, an automobile agency and a franchise, was a dealer. *San Juan Mercantile*, a companion case, stated that a dealer "endeavors to create a favorable market and to draw customers to the product or services by promoting and closing sales contracts." 108 P.R.R. at 220–21. The creation or expansion of a market was stressed as the most important factor. The court also enumerated other characteristics of a dealer that are essential—publicity, market coordination, merchandise deliveries, collections, maintaining inventory, and promotion and closing sales contracts. *Id.* at 221. *See also, American Representatives, Inc. v. Gulf Export Co., Inc.*, Civ. No. 78–2136 (Decision March 31, 1981 (Pérez–Giménez, J.)

In the more recent case of *Cordova & Simonpietri Ins. Agency*, the Puerto Rico Supreme Court emphasized that the dealer must have the ability to complete sales contracts along with creating a market. 112 P.R.R. at 1010. The court stated that an insurance agent was one who solicited, negotiated, effectuated and countersigned insurance contracts. The main essential function of an insurance agent was "to sell insurance policies, that is to say to promote and close insurance contracts...." *Id.*

Consistent federal decisions have found that creation of a market, without more, was insufficient to create a dealership within the meaning of the Dealer's Act. *See EBI, Inc. v. Gator Industries, INC.*, 807 F.2d 1 (1st Cir.1986); *Gonzalez v. Brown Group, INC.*, 628 F.Supp. 436 (D.P.R.1985 (Laffitte, J.); *Franceschini, INC. v. Riley, CO.*, 591 F.Supp. 414 (D.P.R.1984) (Cerezo, J.). Market creation must be equally weighed with the power to close sales contracts in determining whether a party is a dealer. *Franceschini*, 591 F.Supp. 414. The First Circuit has found "closing" to signify "more than a facilitating step toward, but short of, finality." *EBI, INC.*, 807 F.2d at 4. Both federal and local courts have held that commissioned sales people are not afforded protection under Law 75 since neither have authority to close contracts nor take substantial business risk. *Gonzalez*, 628 F.Supp. at 441;

*Franceschini, INC.*, 591 F.Supp. at 421; *Sudouest Import Sales CORP. v. Union Carbide CORP.*, 569 F.Supp. 1547, 1551 (D.P.R.1983) (Pérez–Giménez, J.), *affd.*, 732 F.2d 14 (1st Cir.1984); *Lugo v. Matthew Bender & CO., INC.*, 579 F.Supp. 638, 642 (D.P.R.1984) (Acosta, J.); *CRUZ Ramos v. Brother Int'l. CORP.*, 445 F.Supp. 983, 984 (D.P.R.1978) (Torruella, J.), *aff'd.*, 588 F.2d 817 (1st Cir.1978); *Munarriz v. Captain Sylvain Ledee, INC.*, Superior Court Civ. 67–5799 (904) (Cumpiano, J.).

Another factor to be considered equally with creating a market and closing sales contract is "whether the party assumed a financial risk and took responsibility for the business." *Gonzalez*, 628 F.Supp. at 440. This factor is in agreement with the characterization of a dealer in the case of J. SOLER MOTORS, 108 D.P.R. 134, as an "independent entrepreneur" who has "invested substantially" in the business. To determine whether a party has assumed a substantial business risk, the Court must consider: the extent of investments in real estate for office space, warehouse, equipment, advertising and labor; the extent of authority to negotiate prices, to extend credit and to control the distribution and delivery of the product. *Gonzalez*, 628 F.Supp. at 440. *See Franceschini*, 591 F.Supp. 414; *Cruz Ramos*, 445 F.Supp. 983.

■ We find that Caribbean's relationship with LACSA is one that is covered under Law 75. Caribbean, as general sales agent, had two principal functions under the contract: 1) creating and promoting a market for LACSA's services and 2) selling and closing sales contracts in Puerto Rico. For instance, in promotion, Caribbean had to make personal contact and develop market strategies to reach travel agencies, the public at large, private companies, government agencies, students, special interest groups and ethnic markets. Caribbean coordinated all marketing and promotion activities through its office and through four hundred travel agencies designated under its responsibility.

LACSA attempts to diminish Caribbean's efforts in creating a market by claiming that it paid for all publicity campaigns and that Caribbean neither closed contracts nor made substantial investments. Although LACSA may have paid for publicity campaigns by providing the literature, envelopes and postage, Caribbean helped to disseminate that literature. Nevertheless, Caribbean was not simply engaged in the business of mailing out LACSA's propaganda. In fact, the Vice-president of LACSA testified at the hearing and acknowledged that the work of the general sales agent is promoting sales. (Hearing Tr. of July 23, 1987, page 15.) For instance, Caribbean contacted news media personnel for the purpose of promoting tourism in Costa Rica and Panama from Puerto Rico via LACSA airline. LACSA had highly commended Caribbean in a letter dated May 29, 1984 for its valuable efforts in arranging inexpensive advertising for LACSA's services in Puerto Rico. In said letter, Ramos Yordán arranged for two journalists of a major Puerto Rican newspaper to visit Costa Rica and Panama who did articles featuring these countries' tourist attractions. In addition, through Ramos Yordán's efforts, producers of Channel 2 of San Juan became interested in Costa Rica and Panama which led them to do a series of documentaries. LACSA paid only $2,000 for publicity that would have cost them $201,-600. Caribbean's efforts contributed to increasing the volume of sales in Puerto Rico from $380,000 in 1981 to more than $3,000,-000.

Caribbean did propose plans for expanding LACSA's business in Puerto Rico. For example, Caribbean was exploring the possibility of a Club LACSA in Puerto Rico. (Defendant's Exhibit Y, the minutes of a meeting on July 16, 1985 between an officer of LACSA and the president of Caribbean.) In 1985, Caribbean and LACSA had a meeting to address specifically the need of increasing LACSA's market such as the necessity of additional sellers all over the island. Caribbean also conducted a market study for LACSA's services to and from Puerto Rico and U.S. Virgin Islands. Thus, it is evident that Caribbean had a leading responsibility in promoting a market for LACSA in Puerto Rico.

Not only did Caribbean create a market for LACSA; Caribbean was involved in "closing sales contracts." The case at hand is similar to CORDOVA & SIMON-PIETRI INS. AGENCY, 112 P.R.R. 1003, involving a dealership contract of an insurance agent. Like the insurance agent, Caribbean had the authority to sell and close contracts between LACSA and customers who would purchase travel tickets and freight stubs. LACSA offers a customer transportation to and from Puerto Rico on its airplanes. The customer accepts that offer by purchasing an airline ticket or freight ticket. Caribbean would then sell and close these contracts in Puerto Rico. *See Sudouest Import Sales Corp.*, 732 F.2d at 16 ("did the national contract itself amount to an 'offer' which the customer's purchase order 'accepted'? If so, Sudouest 'closed' the contract."). Caribbean was not simply an order-taker; the sales made by Caribbean were not subject to final approval by LACSA. Caribbean had similar functions of a travel agency in that it sold airline tickets. Yet, Caribbean also had the function of promoting and creating a market, unlike a travel agent. Generally, travel agents would not be protected by Law 75 because travel agents are more like commission sales people who are not engaged in creating a market and they normally sell travel tickets for various airlines. This is not the situation in this case. Although Caribbean partly acted as a regular travel agent, in its relation with LACSA under the General Sales Agent Agreement, Caribbean was actively engaged in promoting a market for LACSA in Puerto Rico.

In addition to promoting a market and closing sales contracts, Caribbean made a substantial investment risk. It invested time, energy and money in the development of a market for LACSA. Although LACSA provided an $8,000 monthly subsidy for Caribbean's operation it was insufficient to cover the capital and business risks. Caribbean was responsible for 29% of the expenses. (Defendant's Exhibit P.) In entering the General Sales Agent Agreement, the stockholders of Caribbean had to dis-

pose of their travel agency, Agencia Seven Travel, a business with gross sales between $400,000 to $500,000 a year. Caribbean had to remodel the Hato Rey office. Later, with increased volume generated by the scheduled flights, Caribbean moved its offices to larger facilities at Santurce. It invested money in decorating, in furniture and equipment for the new office. (Defendant's Exhibit E–1.) In 1986, the financial statement shows a total investment in fixed assets of $78,977 before depreciation, and a net amount after depreciation of $44,645. Caribbean maintained current assets, in connection with its operations, in the amount of $72,676. Its operations were limited to its activities as sales representative for LACSA. For example, Caribbean was responsible for any mistakes in the application of tariffs, for amounts owed by travel agents it selected, if they went insolvent and for bad checks made by customers.[3] Caribbean paid the wages of its seven employees. Therefore, Caribbean made a substantial investment and a significant business risk.

In short, the essence of the relationship between LACSA and Caribbean is one where Caribbean was engaged in: 1) creating and promoting a market for LACSA; 2) selling and closing sales contracts; and 3) assuming substantial business risk. In particular, the latter factor is underscored. Since Caribbean assumed a great risk under this contract, it leads us to the only conclusion that Caribbean is a dealer within the meaning of Law 75.

PROVISIONAL REMEDIES

Since it is clear that Caribbean is a dealer within the meaning of Law 75, we must now consider whether provisional remedies under Article 3A should be granted. *See DeMoss v. Kelly Services, Inc.*, 493 F.2d 1012, 1015 (1st Cir.1974) (the federal district court is not foreclosed from utilizing the provisional remedy of Article 3A for a Law 75 claim). We must also decide whether injunctive relief should be granted to LACSA.

---

3. In these situations, LACSA would debit Caribbean's subsidy. Caribbean, the record shows, was successful in recovering the debitted amounts and thus did not sustain any losses.

In determining Caribbean's request for provisional remedies, the Court must consider both the public policy underlying Law 75 and the interests of all parties concerned. 10 L.P.R.A. sect. 278b-1. *See Luis Rosario, Inc. v. Amana Refrigeration, Inc.*, 733 F.2d 172, 173 (1st Cir. 1984); *Pan American Data Computer Corp. v. Data General Corp.*, 652 F.2d 215, 217 (1st Cir.1981). As previously mentioned, the public policy behind Law 75 was to avoid the abusive practices of suppliers who would, without just cause, eliminate their dealers or agents as soon as a favorable market was created. Laws of Puerto Rico 1964, at 231. As to the other consideration, neither the statute itself nor the case law provides much guidance as to the method of weighing the parties' interests.

In determining LACSA's request for injunctive relief, the standard used in a preliminary injunction question is whether there is a likelihood of success on the merits and the existence of immediate irreparable harm which outweighs any possible harm to defendants from the injunctive relief sought. *Garzaro v. University of Puerto Rico*, 575 F.2d 335, 338 (1st Cir. 1978); *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 115 (1st Cir.1968), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968); *Salomon/Na v. Amf, Inc.*, 484 F.Supp. 846 (D.Mass.1980).

The court is not required under Article 3A to "make formal findings on the usual preliminary injunction criteria of irreparable harm and probability of success on the merits ..." *Pan American*, 652 F.2d at 216–217 (citing *DeMoss*, 493 F.2d at 1015); *Luis Rosario, Inc.*, 733 F.2d at 173 ("under Article 3A the district court *need not* automatically take 'probability of success' into account (citation omitted); but nothing in Article 3A says that it *may not* ever do so") (emphasis provided by the opinion). Nevertheless, "the court's view of the merits would certainly affect its judgment of the weight of the parties' interests and of the injunction's effect on the statutory policies." *Luis Rosario, Inc.*, 733 F.2d at 173 (district court did not err in considering likely presence or absence of just cause in denying injunctive relief); *Pan American*,

652 F.2d at 217. The provisional remedies of Article 3A are designed to maintain the "status quo" and provide for the continuation of the relationship during the pendency of the litigation.

We find that the best interests of the parties would be served by denying their respective requests for injunctive relief. Both sides argue that they will suffer irreparable injury if injunctive relief is not granted immediately. Caribbean alleges it does not have the resources to continue to satisfy the operational expenses considering it no longer receives a subsidy and commission from LACSA. On the other hand, LACSA contends that it runs the risks of losing substantial amounts of money since Caribbean can continue issuing airplane tickets to any part in the world without LACSA's knowledge and without reimbursement. Both argue that their respective good names will be damaged. The parties, however, would be better served by leaving the freight stubs for air travel and airline tickets with Caribbean. LACSA has not demonstrated that Caribbean has been issuing tickets illegally. Moreover, Caribbean is unlikely to issue tickets since it is presently not receiving a commission for its sales. By leaving the situation as it now stands the parties have an incentive to come to an agreement before an arbitrator. Here, the parties agreed in writing to settle any and all disputes through the arbitration route.

## ARBITRATION

■ The merits of both LACSA's and Caribbean's claims would be more properly addressed before an arbitration tribunal. There exists a strong federal policy in favor of arbitration when stipulated by the parties to a contract. Under the Federal Arbitration Act, 9 U.S.C. sect. 1 *et seq.*, a written provision in a commercial contract requiring arbitration to settle controversies is "valid, irrevocable and enforceable, save for such grounds as exist at law or in equity for the revocation of contract." *Id.* at sect. 2.

The Federal Arbitration Act preempts contrary state law. *Southland Corp. v.*

*Keating,* 465 U.S. 1, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984) (the power of States to require judicial resolution of disputes which the contracting parties have agreed to submit to arbitration has been withdrawn by the Federal Arbitration Act). Specifically, the Supreme Court, in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), upheld the First Circuit's ruling that Section 3B of the Puerto Rico Dealers' Act, 10 L.P.R.A. 278b–2, which does not recognize any arbitration agreement that "obligates a dealer to ... arbitrate ... any controversy, regarding the dealer's contract to arbitrate outside of Puerto Rico, or under foreign law or rule of law," has been preempted by the Federal Arbitration Act.[4] In fact, this federal policy extends to situations when there are doubts concerning the scope of arbitrable issues such as construction of the contract language, issues of waiver, delay or similar defenses. 105 S.Ct. at 3354, citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

In this case there are two arbitration clauses. In the body of the contract, paragraph 17 provides:

> For the final resolution of all disagreements ("desavenenciàs") that may arise from the present contract, both parties expressly submit themselves to the arbitration of the judiciary of the International Air Transportation Association (IATA) under the procedural rules established by said body.

(Our translation.) In the "Additional Clauses to the Contract ...," it is provided at paragraph 5 that:

> All disagreements that may arise from the preceding additional clauses exclusively shall be finally resolved, in accordance with the "Reglamento de Concilia-

ción y Arbitraje de la Cámara de Comercio Internacional," by one or more of the arbitrators appointed in accordance with said Regulation.

(Our translation.)

It is evident with two arbitration clauses in the contract the parties intended to submit all disputes to an arbitrator. We will enforce arbitration agreements by the parties as required by the strong federal policy and shall not attempt to rewrite the contract. *Luis Rosario, Inc.,* 733 F.2d 172. There is nothing in the record or in the case law to indicate that these clauses are improper or not binding on the parties.

Caribbean would like this Court to believe that LACSA violated the spirit and intent of the agreement to arbitrate by allegedly unilaterally terminating the contract without submitting the dispute to arbitration. Contrary to Caribbean's allegation, the Court finds that LACSA has not in any manner waived its rights under the arbitration clauses. *Sea–Land Service, Inc., v. Sea–Land of Puerto Rico,* 636 F.Supp. 750 (D.P.R.1986). From the commencement of LACSA's action against Caribbean, the former has been enforcing its rights to arbitration. In fact, LACSA's case, (Civ. No. 87–857), is a declaratory action requesting an order compelling arbitration. After the complaint, LACSA moved for an order compelling arbitration. Furthermore, in May of 1987, before any lawsuit was filed, both parties had negotiations to form a new contract or to modify the existing contract which proved to be unsuccessful.

We will grant LACSA's motion to enforce arbitration. However, since there appears to be a lack of clarity in the General Sales Agent Agreement as to which of the two arbitration clauses apply to this controversy,[5] this matter is hereby set for a hearing on *January 21, 1988, at 2:00 P.M.*

---

4. It is worthwhile noting that Puerto Rico Supreme Court has held that although this federal policy is precedent in federal court, it does not constrain Commonwealth courts. *Walborg Corp. v. Superior Court,* 104 D.P.R. 184, 104 P.R.R. 258 (1975) (the Puerto Rico Supreme Court held a clause in a dealer's contract requiring disputes to be settled by arbitration in New York City according to New York State law offended Puerto Rico's public policy). This ruling, however, has been superseded in cases where the Federal Arbitration Act applies. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, supra.*

5. At first glance, it seems that IATA arbitration applies to controversies over the provisions of

WHEREFORE, Caribbean's motion for provisional remedies under Law 75 is DENIED.

LACSA's motion for temporary restraining order is DENIED.

Defendant's motion to compel arbitration is GRANTED.

The Court hereby declares that the General Sales Agreement between Caribbean and LACSA is a dealer's contract under Law 75. All remaining issues, claims and defenses raised in this action are subject to arbitration.

A hearing is hereby set for *January 21, 1988, at 2:00 P.M.,* to determine whether paragraph 17 of the General Sales Agent Agreement or paragraph 5 of the "Additional Clauses" controls the arbitration proceedings in this matter.

IT IS SO ORDERED.

### APPENDIX

L a c s a

The Airline of Costa Rica

February 2, 1982

Mr. Edwin Ramos Yordán

President

Caribbean General, S.A.

San Juan, Puerto Rico

Dear Mr. Ramos Yordán:

In accordance with our conversations and the interest you have shown in representing LACSA as General Agent for Passenger and Cargo Sales in the territory of Puerto Rico, I am pleased to inform you about the approval of your request, ratified by the System Sales Director and the Commercial Director of LACSA.

I am enclosing four sets of the General Agency contract already signed by Mr. Orlando Ramírez for you to sign, keeping one copy and returning the remaining three to us.

You must of course establish an adequate office that meets the standards set by the majority of the other airlines of Puerto Rico and that fulfills the required safety measures, designating the person charged with handling the Company's valuables. Once we were notified, company representatives would travel with me to that city to deliver the tickets and air waybills to you, open the bank accounts and establish the accounting procedures.

The sales and marketing responsibilities that you must fulfill shall be the following:

I.—To develop marketing study covering the territory of Puerto Rico.

II.—To establish a Regional Sales Office in Puerto Rico that will carry out LACSA's daily sales activities in this territory.

III.—To assign qualified personnel to give adequate service to the territory in question.

IV.—To implement appropriate marketing plans that include strategic assistance in the following:

A.—Travel Agency Sales—retailers/wholesalers

B.—Commercial Accounts

C.—Interline Sales

D.—Group Sales

E.—Incentive trips

F.—Special interest groups

G.—Student trips

H.—Cargo sales

I.—Ethnic Market

Some of the marketing strategies that will be used and services to be offered shall be the following:

(a) Visits to the agents with the greatest production in said territory.

(b) Visits to commercial accounts in the territory to obtain business passengers and cargo.

(c) Visits to cargo agents within the territory.

(d) Visits to Universities and Institutes in the territory with the aim of promoting individual and group trips.

(e) Regular direct mailings on sales/cargo to Travel Agencies, Commercial Accounts, certain organizations and interline associates within the territory.

the main contract, while the Cámara de Comercio International Arbitration is applicable to the labor, patents and permits set forth in the first four paragraphs of the "Additional Clauses of the Contract."

(f) Supporting and assisting with all kinds of information the advertising and promotion efforts within each one of the regions.

(g) Assisting the Sales Director, North America, by informing him about the structure of commissions for travel agencies, advertising strategy, participation in the computerized reservation systems, OAG listings, travel agency programs, flight schedules, and development of promotion programs.

(h) Developing new tour programs by working with tour operators within each one of the regions.

(i) Developing a practical program of fam. trips for travel agencies that make great sales within the regions in question.

(j) Participation in industry functions.

(k) Sending the Sales Director, North America, a monthly activity report clearly indicating sales made during that month.

(*l*) Providing the Sales Director, North America, with information related to current rate levels.

(m) Carrying out the activities necessary to support LACSA's marketing system, the sales efforts of the Sales Director, North America, and approving the marketing plan for Puerto Rico.

Please send us a map of Puerto Rico indicating the most important cities.

I am also enclosing the Salesman's Handbook of LACSA for North America, which contains the administrative policies of our organization. I call your attention particularly to Section V, the Section on Reports, indispensable for communication between that territory and my Office. The reference terms for the Sales Executive to be appointed are included in Section VII, as well as LACSA's organizational chart in North America, explaining your line of communication in the company.

Immediately following you shall find the format to be used in elaborating the Marketing Plan to be elaborated and submitted by you to the Sales Executive designated.

Once the requirements set forth hereinabove have been completed, I will be sending you additional information about your economic goals and about how we control sales productivity in the territories through our statistics.

I wish to give you the most cordial welcome to our proud sales team of LACSA, North America, and to our dear Company.

If you desire any additional information, please do not hesitate in contacting me.

Yours truly,

LACSA AIRLINES

(sgd.) William Jauregui

Sales Director, N.A.

WJ:grm.—

Encl.—

c.c.: O. Ramírez, LACSA/SJO

J. Giralt, LACSA/SJO

R. Carrillo, LACSA/MIA