Jorge Luis GONZÁLEZ, etc., Plaintiffs,

v.

BROWN GROUP, INC. and Brown
Shoe Company, Defendants.

Civ. No. 85–2130 HL.

United States District Court,
D. Puerto Rico.

Dec. 27, 1985.

Russell A. del Toro, Roberto Santana Aparicio, Hato Rey, P.R., for plaintiffs.

McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria, San Juan, P.R., Maggie Correa-Avilés, for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiffs, Jorge L. González and his wife Lizette López-Cepero de González, brought this action against defendants, Brown Group, Inc. and Brown Shoe Co. ("Brown Shoe"), alleging that Brown Shoe terminated plaintiff Jorge González' employment without "just cause" in violation of Puerto Rico Act 75, 10 L.P.R.A. § 278 et seq. ("Law 75"), and in a tortious breach of contract. Plaintiffs are citizens of the Commonwealth of Puerto Rico and defendant, Brown Shoe, is a foreign corporation with its central office and principal place of business in St. Louis, Missouri. This Court has diversity jurisdiction of the controversy under 28 U.S.C. Sect. 1332.

Plaintiffs requested an injunction *pendente lite* under Section 3–A of Law 75, 10 L.P.R.A. 278b–1.[1] A hearing was held on

---

1. Section 3–A, 10 L.P.R.A. Sect. 278b–1 provides: "In any litigation in which there is directly or indirectly involved the termination of a dealer's contract or any act in prejudice of the relation established between the principal or grantor and the dealer, the Court may grant, during the time the litigation is pending solution, any provisional remedy or measure of an interdictory nature to do or to desist from doing, ordering any of the parties, or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof. In any case in which the provisional remedy herein provided is requested, the Court shall consider the interests of all parties concerned and the purposes of the public policy contained in this chapter."

November 13 and 14, 1985, to determine whether an injunction should issue. At the conclusion of plaintiff's case defendants presented a motion to dismiss under Fed.R. Civ.P. 41(b). The Court reserved judgment, and proceeded to hear all the evidence. Defendant reasserted its motion to dismiss at the close of its case. Defendants argue that plaintiff has failed to state a claim under Law 75 because he is not a "dealer" within the meaning of the act and, in the alternative, no violation was committed because his employment with Brown Shoe was terminated with "just cause." Because we find that plaintiff, Jorge González, is not a "dealer" covered by Law 75, we dismiss his claim without considering whether there was "just cause" for termination.

## I. FACTUAL BACKGROUND.

In November 1975, plaintiff Jorge González contracted with Brown Shoe to serve as its representative in Puerto Rico and the U.S. Virgin Islands. Plaintiff's job was to promote the sale of the full line of Brown Shoes.[2] When González started as defendants' representative in 1975, Brown Shoe's only client in Puerto Rico was González Padín—a large department store on the island. Though González Padín remained Brown Shoe's largest client, plaintiff succeeded in soliciting orders from several other retail stores during his term of employment.[3] Based on the figures submitted at the hearing on the rate of shoe sales in Puerto Rico during plaintiff's ten year employment, it is undisputed that the market for Brown Shoe products increased as a result of plaintiff's efforts.

At the beginning of plaintiff's relationship with Brown Shoe he was provided a monthly draw of $1,000 on his sales commission. Plaintiff continued to receive a draw for one year when he chose to go on straight commission. The commission was set at 5% of the value of each shoe order and was paid upon shipment of the shoes to the client, regardless of whether payment for the order was made.[4] Brown Shoe provided plaintiff with medical and dental insurance, life insurance, disability insurance, paid absence time, a pension plan, an employee stock purchase plan, tuition assistance and a matching education grant. The company did not, however, deduct from plaintiff's pay checks federal or local taxes, social security, workmen's compensation or unemployment compensation. Plaintiff was also provided with no paid vacation time. He took his vacation whenever he preferred, provided he notified the central Brown Shoe office in St. Louis.

As the exclusive representative of Brown Shoe in Puerto Rico, plaintiff was responsible for maintaining Brown Shoe's relationship with old clients and for soliciting new clients. To carry out his work he rented office space. He paid for his own phone, mailings and travel to visit his clients, but had no other business expenses. He hired no employees, carried no inventory, rented no warehouse space, and did no advertising.

Brown Shoe supported plaintiff in his efforts to promote their shoes in Puerto Rico by providing him with a sample of

2. Brown Shoe lines include: "Naturalizers," "Life Stride" and "Buster Brown" among others. Plaintiff's job differed from the job of Brown Shoe sales representative in the Continental United States who were allowed to represent only one line of shoes. This, however, appears to be the only major distinction between plaintiff's job and that of other sales representatives.

3. The retail stores added to the list of Brown Shoe clientele include: Novus, Pimpolín, Big & Beautiful, A. Barreto Shoe Store, Pequeñin, Emerald Corp., Shoe Warehouse, and Seedman's. The evidence is ·controverted as to who made the initial contact and solicited orders from each of the new clients. It appears that certain retailers contacted Brown Shoe directly, while other clients González obtained through his efforts alone.

4. The evidence reflects and the Court finds that it was Brown Shoe's policy to absorb the loss for an unpaid order. Plaintiff attempted to controvert this issue by testifying that on only one occasion he could remember was he held liable for an order out of hundreds of orders submitted. This testimony is insufficient to contradict the weight of evidence indicating the Brown Shoe policy.

each style shoe, company stationery, and advertising upon occasion. Brown Shoe orders could either be made through plaintiff, who would forward them to the central office for approval, or made to the Brown Shoe Co. directly.

Though it was left to plaintiff's discretion to determine which retail stores to solicit for business, final approval of all orders was reserved by the central office. On the face of each order form it stated:

"This order is subject to approval of the Brown Shoe Company, Div. of Brown Group, Inc., through a duly authorized representative in St. Louis and is taken subject to fires, accidents or other causes beyond our control. It is also understood that we will be allowed reasonable time after specified shipping date for completion of order. All terms, agreements, understandings, etc. must be expressed in writing, as no other will be recognized."

Plaintiff had no authority to set prices or extend credit to Brown Shoe clients. Prices were fixed centrally at the central Brown Shoe office. The credit worthiness of a client or potential client was ultimately determined by the Brown Shoe credit office in St. Louis. Upon occasion Brown Shoe would extend credit to assist certain clients. Plaintiff had no inventory or warehouse and had no involvement with shoe deliveries. All orders were shipped by the central office directly to the client. Payment was made directly to the central St. Louis office.

In early 1983, at their meeting at the Chicago Shoe Show, Mr. Gephardt confronted plaintiff with problems in his work habits. By memo dated February 7, 1983, Mr. Gephardt summarized the issues discussed: Mr. González had failed to maintain sufficient communication with the central office through daily telephone calls or weekly "routers" stating his schedule, he did not visit his clients with sufficient frequency, and he was slow in submitting orders. Between 1983 and plaintiff's termination in September, 1985, several discussions were had concerning Mr. González' failure to improve his work habits. Memos were sent confirming these discussions. The issues raised were similar or identical to those raised in February, 1983—failure to contact the central office, failure to write up marketing plans and slowness in submitting orders.

Tension between the parties peaked in September, 1985, when Mr. Gephardt discovered plaintiff had failed to submit two large orders; one from Shoe Warehouse and the other from González Padín. Brown Shoe was able to comply with the González Padín order by sending the shoes air freight. The Company covered the extra cost of sending the order by air rather than by sea. As for the Shoe Warehouse order, Mr. Gephardt testified that the late notice caused the Company to lose a major portion of the sale.

Upon discovery of González' failure to submit these orders, Mr. Gephardt sent plaintiff a letter of termination. The reasons cited for his termination were his failure to improve his work habits criticized over the past two years and his failure to submit the Shoe Warehouse and González Padín orders.[5]

## II. LAW 75—WHO IS A "DEALER"?

■ The issue raised by defendant's motion to dismiss is whether plaintiff's activities as a manufacturer's representative for Brown Shoe make him a "dealer" as defined by Law 75 and bring him within the protection of the Act.[6] Puerto Rico's Law 75 protects a "dealer" from unilateral ter-

---

5. Mr. Gephardt testified that an additional reason for terminating González was that he was representing "Sebago", another shoe line. This reason, however, was not stated in the letter of termination.

6. In their post-hearing brief plaintiffs suggested we certify this issue under Rule 53.1(c), 32 L.P.

R.A. App. II, R. 53.1, to be decided by the Puerto Rico Supreme Court. We find that there is adequate precedent for this issue in the decisions of the Supreme Court of Puerto Rico and that the issue is not appropriate for certification. This Court has proper jurisdiction and authority to decide defendant's motion.

mination by a "principal"—the supplier of the products or services.[7] The purpose of this Act was to remedy the abusive practices of suppliers who arbitrarily eliminated distributors after they had invested in the business to build a market for the supplier's product or service. *Warner Lambert v. Tribunal Superior*, 1 P.R. Supreme Court Official Translation 527, 101 D.P.R. 378 (1973). The Statement of Motives of Act No. 75 reads:

> The Commonwealth of Puerto Rico cannot remain indifferent to the growing number of cases in which domestic and foreign enterprises, without just cause, eliminate their dealers, concessionaries, or agents, or without fully eliminating them, such enterprises gradually reduce and impair the extent of their previously established relationships, as soon as these have created a favorable market and without taking into account their legitimate interests.

Vol. 18, Part 4, Diario de Sesiones 1724.

A "dealer" is defined by Law 75 as:

> [a] person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representative of a given merchandise or service.

10 L.P.R.A. sect. 278(a). A "dealer's contract" is defined as:

> [the] relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize, or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or if the rendering of a service by

concession or franchise, or the market of Puerto Rico.

10 L.P.R.A. sect. 278(b).

By limiting the definition of a "dealer" the Puerto Rico Legislature indicated that it did not intend to extend Law 75 protection to every middle person, between the manufacturer and the consumer, in contact with a product or service.[8] Yet, based on the definition of "dealer," combined with that of a "dealer's contract," it is difficult to discern where the line is drawn between protected and unprotected parties. The activities of a "dealer" defined by Law 75—distribution, agency, concession or representation—do not establish fixed legal relationships. As stated by the definition of a "dealer's contract," a principal and a dealer may enter into a contract protected by Law 75 no matter how they characterize or execute their relationship. Hence, for example, a party may be termed an "employee" by the principal but his activities of distribution, representation or concession make him a "dealer" as defined by Law 75. And, vice versa, a party labeled a "sales representative" may not come within the protection of Law 75, if his business activities and employment relationship do not comply with the definition of a "dealer."

Since the legislative history of Law 75 explains only the purpose of the Act and is of no assistance to assess its coverage, *see Franceschini, Inc. v. Riley Co.*, 591 F.Supp. 414, 416 (D.P.R.1984) (Cerezo, J.), the court must look to the Puerto Rico Supreme Court's interpretation of the law and to the decisions of this court. Two decisions of the Puerto Rico Supreme Court, in particular, establish guidelines to determine which parties are protected: *J. Soler Motors v. Kaiser Jeep Int'l. Corp.*, 8 P.R. Supreme Court Official Translation

---

**7.** Section 2, 10 L.P.R.A. sect. 278a states:

> "Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause."

**8.** In *J. Soler Motors v. Kaiser Jeep Int'l. Corp.*, 8 P.R. Supreme Court Official Translation 38, 108 D.P.R. 134 (1978), the Puerto Rico Supreme Court identified various stages in the transfer of goods from manufacturer to consumer. Whether the "middle" person at each of those stages is covered by Law 75 depends on whether his activities and his relationship to the principal meet the characteristics of a "dealer" as defined by the Supreme Court of Puerto Rico.

138, 108 D.P.R. 134 (1978), and *San Juan Mercantile v. Canadian Transport Co., Ltd.*, 8 P.R. Supreme Court Official Translation 218, 108 D.P.R. 134 (1978). *J. Soler Motors* characterized a dealer as an:

> independent entrepreneur [whose relationship with the principal] is devoid of hierarchical subordination and [who] has made a substantial investment [in the business].

Id. at 145. *San Juan Mercantile* states that a Law 75 "dealer" is a party who:

> endeavors to create a favorable market and to draw customers to the product or service by promoting and closing sales contracts.[9]

Id. at 220–21.

Though the Puerto Rico Supreme Court has stressed that the creation or expansion of a market as the most important factor to determine whether a party is covered by Law 75, *San Juan Mercantile, supra,* at 221, it has identified a myriad of other factors which are also essential characteristics of a "dealer." Id. These factors include publicity, market coordination, merchandise deliveries, collections, maintaining inventory, and promotion and closing of sales contracts. Id. at 221. *See also, American Representatives, Inc. v. Gulf Export Co., Inc.,* Civ. No. 78-2136, (Decision March 31, 1981) (Pérez-Giménez, J.).

In *Franceschini, Inc. v. Riley Co., supra,* this court was presented with the question whether the creation of a market, albeit small, is enough to grant a business promoter the status of an Act 75 dealer, without evidence of the other factors characterizing a dealership. The court found that creation of a market alone was not enough to be a "dealer" within the meaning of the Act. It held that market creation must be balanced equally with the authority to close sales when determining whether a party is protected by Law 75. As the Court explained, if market creation were given unbalanced weight then individuals such as promoters, brokers, advertising agents and others removed from the distribution process could claim Law 75 protection, even though such expansive coverage was not the intent of the Puerto Rico Legislature.

We agree with *Franceschini* that a dealer cannot be defined by the activity of promoting merchandise and creating a market alone. However, we suggest that the second factor to be weighed equally with market creation is whether the party assumed a financial risk and took responsibility for the business. This factor is consistent with the characterization of a "dealer" in *J. Soler Motors* as an "independent entrepreneur," who has "invested substantially" in the business.

Whether the party had authority to close sales contracts is just one consideration to assess whether a risk was assumed and responsibility for the business taken. Other considerations include those factors identified by the Puerto Rico Supreme Court in *San Juan Mercantile* and others identified by this court in prior Law 75 decisions: the extent of investment in real estate for office space, warehouse, equipment, advertising and labor; the extent of authority to negotiate prices, to extend credit and to control the distribution and delivery of the product. *See, Franceschini, supra; Sudouest Import Sales Corp. v. Union Carbide Corp.,* 569 F.Supp. 1547 (D.P.R.1983) (Pieras, J.); *Cruz Ramos v. Brother Internat. Corp.,* 445 F.Supp. 983 (D.P.R.1978) (Torruella, J.).

In the case of a commissioned sales person both this Court and the local courts have held that there is no Law 75 coverage. *Franceschini v. Riley Co., supra; Sudouest Import Sales Corp. v. Union Carbide Corp.; Cruz Ramos v. Brother International Corp., supra; Frank Munarriz v. Captain Sylvain Ledee, Inc.,* Superior Court Civ. 67–5799 (904) (Cumpiano, J.). In each of these cases no protection was extended because the plaintiff had assumed little or no financial risk and had taken no

---

**9.** See also, *Córdova v. Simonpietri Insur. Agency,* 12 P.R. Supreme Court Official Translation 1003, 112 D.P.R. 797 (1982), where the Court stressed that a dealer is characterized by his activities of creating a market and closing sales contract.

other business responsibilities associated with a Law 75 dealer.

In *Franceschini* plaintiff was the exclusive representative in Puerto Rico for defendant's "panalarm" products. Plaintiff's activities included visiting clients to inform them of defendant's products and advertising the product in a local trade publication. To assist in the promotion of the product, plaintiff hired employees with a technical background and sent them to the United States for training about the product's technical features. Plaintiff was paid a commission on each purchase order received and approved by defendant. All orders taken by plaintiff were subject to defendant's approval. Defendant alone was authorized to set prices. Defendant did all the billing, shipping, delivery and servicing of the products. The evidence showed that defendant gave plaintiff the names of some clients to contact, but, others were solicited through plaintiff's own efforts.

Although plaintiff expanded defendant's market in Puerto Rico somewhat and invested in the business by hiring employees and advertising the product, the court held this was insufficient to bring plaintiff under the protection of Law 75. Plaintiff did not have the authority to approve or reject orders—in other words, to close sales. It had no inventory or warehouse. It had no authority to fix prices or terms of sale. And, it did no billing and had no involvement in the delivery of the orders. Based on this evidence of the parties' relationship, the court found plaintiff "assumed neither the risks nor the responsibilities that go with an Act 75 dealership." *Franceschini, supra,* at 420.

In *Frank Munarriz* the Superior Court of Puerto Rico was presented with a similar situation. Plaintiff was the exclusive representative of defendant's products in Puerto Rico. He rented his own office from which he carried out his work. Plaintiff solicited orders from contractors and submitted them to defendant for approval. Defendant was in charge of all shipment and delivery of the merchandise. Plaintiff was paid a 10% commission on all final sales. Evidence in the case showed that the major portion of defendant's sales in Puerto Rico were due to plaintiff's efforts. The Superior Court characterized plaintiff as a commissioned salesperson and held that he was not protected by Law 75.

We find that plaintiff González' relationship to the Brown Shoe Co. is similar to that of a commissioned salesperson and that his activities as a Brown Shoe representative in Puerto Rico do not bring him within the protection of Law 75. Though plaintiff expanded the market for Brown Shoe, as is the job of a commissioned salesperson, this factor is outweighed by the fact that plaintiff assumed little financial risk or business responsibility. Plaintiff made no real investment in the business of distributing Brown Shoes. Brown Shoe assisted plaintiff in the promotion of their product by providing him with shoe samples, stationary and some advertising at their expense. Plaintiff's only expenses were office rental, his phone bill and travel. He hired no employees, had no major equipment, had no inventory or warehouse.

Though plaintiff had the discretion to choose which retail shoe stores in the Puerto Rico market to solicit for business, he had no further responsibility for the business once orders were submitted to the central Brown Shoe office. Plaintiff had no authority to negotiate the price of shoes or other sales terms set by Brown Shoe. He had no authority to give final approval or rejection of the orders. All submitted orders were subject to a credit check and approval by the central office. Plaintiff had no involvement with shipment or delivery of the merchandise. Brown Shoe delivered the shoes directly to the client.

Because plaintiff González is not a dealer within the confines of Law 75, his first cause of action predicated thereunder fails to state a claim upon which relief can be granted and is hereby dismissed.

█ Plaintiff asserted a second cause of action for tortious breach of contract. None of the parties addressed this aspect of the case. All efforts were concentrated and focused on the Law 75 issue. Regard-

ing the tortious breach of contract allegations, plaintiff's scant assertions are encompassed in two paragraphs containing conclusory allegations to the effect that defendant's unilateral termination of the agreement was carried out in bad faith and was a tortious breach thereof; that said breach hindered plaintiff González in marketing defendant's products in Puerto Rico. Even though plaintiff incorporated by reference the allegations set forth in the first cause of action, no description of the agreement appears in the complaint other than the allegation that defendants retained plaintiff González ten years ago to act as their independent factory sales representative for the territory of Puerto Rico and the Caribbean.

It is well settled that even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim. *Martin-Trigona v. Stewart,* 691 F.2d 856 (8th Cir.1982); *Dodd v. Spokane County, Washington,* 393 F.2d 330 (9th Cir.1968). Hence, plaintiff's second cause of action shall be likewise dismissed but with leave to amend.

WHEREFORE, plaintiff's claim under Law 75 is hereby ordered DISMISSED, and there being no just reason for delay, the Clerk is directed to enter partial judgment dismissing plaintiff's first cause of action with prejudice; and it is further

ORDERED, that plaintiff's second cause of action is hereby DISMISSED without prejudice. Plaintiffs are granted twenty days to file an amended complaint as to the second cause of action.

IT IS SO ORDERED.