**Luis A. MORALES, Plaintiff,**

v.

**GREGG SHIRT MAKERS, INC., d/b/a Hutspah Shirts, Defendant.**

**Civ. No. 87–774 HL.**

United States District Court,
D. Puerto Rico.

March 11, 1988.

Rodrigo Otero Bigles, Hato Rey, P.R., for plaintiff.

Roberto Santana Aparicio, Del Toro & Santana, Hato Rey, P.R., for Gregg Shirt Makers, Inc.

### OPINION AND ORDER

LAFFITTE, District Judge.

This action was removed by defendant to U.S. District Court on the basis of diversity jurisdiction. Defendant corporation, Gregg Shirt Makers, Inc. ("Gregg"), is a manufacturer of shirts and a resident of Pennsylvania. Hutspah is a division of Gregg and a line of shirts. Plaintiff Luis A. Morales is a resident of Puerto Rico and was the exclusive sales representative of Hutspah shirts on the island until early 1987, when defendant unilaterally terminated the relationship. Plaintiff responded by bringing suit and alleging a violation of the Puerto Rico Dealers Act, Act No. 75, 10 L.P.R.A. sect. 278 *et seq.* Defendant filed a motion to dismiss grounded on the argument that plaintiff is not entitled to invoke Law 75 because he was not a "dealer" under the statute. Plaintiff opposed this motion. On February 25, 1988 an evidentiary hearing was held confined to the issue raised by the motion to dismiss—plaintiff's status as a dealer under Law 75.

## FINDINGS OF FACT

The facts as gleaned from the parties' motions and as presented in open court are largely undisputed when viewed as a whole. Each of the parties, not surprisingly, emphasized certain facts at the expense of certain others. Bernard Dunn, president of Gregg Shirts testified for defendants. Luis Morales testified for himself.

Plaintiff was defendant's exclusive representative in Puerto Rico and the Virgin Islands from 1979 through 1986, inclusive. During this eight year period plaintiff sold roughly $880,000 worth of defendant's merchandise, for an annual average of about $110,000. The previous representative for the area, Mr. Arias, had averaged $72,000 per year for three years. Plaintiff's receipts represent a 53% increase over his predecessor. The representative who succeeded Morales "wrote" $550,000 of business in his first year, 1987. There is evidence in the record, however, that the successor had both the men's and boy's lines, while plaintiff had only the men's. Though the precise genesis of the $550,000 figure was not made clear at the hearing, it was generally agreed that in 1987 sales in Puerto Rico had experienced a sharp increase.

In addition to the bare dollar figures, the number of active accounts also increased substantially. Though plaintiff submitted into evidence a list of some 80 clients, only about 30 of these had bought Gregg shirts in 1986. In 1987, 205 different clients bought Gregg shirts. Though Gregg made Morales' client list available to his successor, Morales had had to get the corresponding information directly from Arias. It was Arias who had initially recommended Morales to Gregg as his replacement.

Over the eight year period plaintiff's sales figures varied considerably. In 1980–81 plaintiff averaged $137,000. In 1982–83 the average was $55,000. 1984–85 saw a sharp rise to $165,000, only to fall back down to $79,000 in 1986. The percentage of bad accounts which could not be collected remained very low, even minimal, thoughout, compared to the company's other representatives.

The mechanics of the relationship operated as follows. Defendant would send plaintiff samples of its line of shirts from time to time, especially for the peak spring and fall seasons. The samples remained the property of the company, and eventually would be sold or returned to the company. Plaintiff shared a showroom with another representative where he displayed the current line of Hutspah shirts, in a separate room from the other lines he carried. Employed at the showroom were one full and one part time employee. Plaintiff's share of the rent and other overhead came to approximately $1,000 per month. About half of Morales' Hutspah business was conducted out of the showroom, the other half by journeying to his retail clients with his samples in tow. Plaintiff received an 8% commission on all sales. There was no formalized quota of sales. Defendant set all prices for the shirts, though on at least one occasion plaintiff secured a concession from Gregg of a lower price for a certain client. The letter sent from Gregg's president, Bernard Dunn, to plaintiff in 1979 agreeing to make him the representative alerted plaintiff to the availability of price concessions with prior approval.

Plaintiff maintained no inventory of defendant's merchandise. After soliciting and receiving orders from his clients, he transmitted them to defendant in Philadelphia. Defendant carried out all credit checks with the help of a third party. The decision whether to approve a sale was entirely defendant's. Plaintiff took no credit risk, except on either two (according to defendant) or five or six occasions (according to plaintiff) when plaintiff was able to conclude deals that might otherwise have been disapproved by promising Gregg to personally assume half of the credit risk. Plaintiff often aided his clients in filling out Gregg's credit form. When clients whose credit was approved nevertheless failed to make payments, defendant Gregg alone took responsibility for collection. Plaintiff once followed up a bad account by seeking collection and a few times picked up checks and mailed them to the company before the ordered goods were delivered. Gregg Shirts mailed the merchandise di-

rectly to the client without the intervention of Morales. The 8% commissions on plaintiff's sales accounts that were never collected, a very low figure, was eventually deducted from later commissions.

The level of advertising in which Morales and Hutspah engaged on the island was not great. Each year plaintiff operated a booth at an annual Caribbean trade fair in San Juan. The first year the parties shared expenses, thereafter Morales alone picked up the tab. On two occasions plaintiff had flyers printed at his own expense (about $200 each) depicting models wearing Hutspah shirts, suitable for display in his clients' retail stores. Two or three times he managed to include Hutspah shirts in comparative advertisements with other products, for which he paid about $200 each time.

In January 1987 defendant informed plaintiff that his status as exclusive representative was being terminated for failure to increase his business. After plaintiff's attorney responded by informing defendant of plaintiff's intention to sue, defendant offered in a letter to give Morales his line back. Morales never responded to the offer. Though the termination was abrupt, the evidence indicates that in early 1985 Hutspah was on the verge of granting exclusive representation to another man. When Morales objected, Hutspah backed off and reaffirmed its committment to Morales. Dunn testified that but for want of a suitable replacement, he would have given the line to another person in 1982–83 during plaintiff's first slump.

It was generally acknowledged that Hutspah shirts were a fashion line, sales of which were subject to varying degree of ups and downs from year to year. For example, a Tom Selleck signature line did particularly well at the height of popularity of the television program "Magnum, P.I." in the early 1980's.

## CONCLUSIONS OF LAW

A dealer is defined by Law 75 as "a person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distributorship, agency, concession, or representative of a given merchandise or service." 10 L.P.R.A. sect. 278(a). Upon these bare guidelines the courts have constructed a litany of factors to determine if a plaintiff is protected by Law 75. Not infrequently the dispute has entailed facts similar to those at bar and turned on resolution of the identical question—is plaintiff a salesman or a dealer?

The first and most important factor is the plaintiff's role in creating and enlarging the relevant market for the manufacturer's goods. Stopping manufacturers from abusively eliminating dealers who had created a market was the basic and avowed purpose of the act. Statement of Motives of Act No. 75, Vol. 18, Part 4, Diario de Sesiones 1724. The Puerto Rico Supreme Court has ruled that "[t]he dealer is principally identified by his efforts to develop a favorable market ..." *San Juan Mercantile Corp. v. Canadian Transport Co., Ltd.*, 108 D.P.R. 211,215 (1978). Other general factors include "publicity, market coordination, deliveries of product, collections, keeping an inventory, and the promotion and execution of sales contracts ..." *Id.* The degree of independence and control that the dealer retains, including the power to set prices, and the dealer's assumption of financial risk have also been considered relevant. *See Rivera Lugo v. Matthew Bender & Co., Inc.*, 579 F.Supp. 638 (D.P.R.1984), and cases cited at 642.

Applying these standards to this case it becomes readily apparent that plaintiff was not a dealer entitled to the protection of Law 75. Except on extremely limited occasions (once or twice), Morales had no responsibility for delivery of Hutspah shirts, collection of money, credit risk, or price setting. He maintained no inventory. Morales' job basically ended after he had solicited orders and sent them to Philadelphia. The very few times he engaged in dealer-like activities such as collection are not sufficient to convert plaintiff from a salesman into a dealer. *See Sudouest Import Sales Corp. v. Union Carbide Corp.*, 732 F.2d 14 (1st Cir.1984). Moreover, it is clear that plaintiff took no significant entrepre-

neurial risk. He did not purchase merchandise from the manufacturer then resell it at a price he determined. Advertising expenses were minimal and limited to a few occasions. The only real expense was the office space and staff for showrooms. This alone does not a dealer make. *See Gonzalez v. Brown Group, Inc.,* 628 F.Supp. 436 (D.P.R.1985); *Rivera Lugo, supra* (plaintiff also regularly helped collect on bad accounts and delivered the merchandise).

The one factor which plaintiff ostensibly has in his favor is his enlargement of the market for defendant's goods. Plaintiff increased sales an average of 53% over his predecessor. While this factor may very well be the most important single one, various decisions have made it clear that it is not the only factor to be weighed, but must be balanced with the other factors. *See Rivera Lugo, San Juan Mercantile, Gonzalez, supra; Franceschini, Inc. v. Riley Co.,* 591 F.Supp. 414, 416 (D.P.R.1984). All of the other factors militate against finding that plaintiff was a dealer. Furthermore, though it is undisputed that plaintiff increased sales of Hutspah products, some of his business represented holdovers from his predecessor. The plaintiff in *Gonzalez* was found not to be a dealer despite the fact that he had been the first ever sales representative for the manufacturer on the island and thus had created, and not merely enlarged the manufacturer's market. Finally, without venturing into a determination of whether there was good cause for the termination, the size of the enlargement of the market attributable to plaintiff's efforts does not loom as so significant a factor when compared to the increase in sales which has occurred subsequent to his termination.

WHEREFORE, defendant's motion to dismiss is GRANTED. The Clerk is directed to enter judgment dismissing the case.

IT IS SO ORDERED.