**Cary R. PATTERSON d/b/a Ford Military Auto Sales, Plaintiff,**

v.

**FORD MOTOR COMPANY and Overseas Military Sales Group d/b/a Military Car Sales, Inc., a/k/a Ford Military Car Sales, Defendants.**

**Civil No. 95–1473 (JAF).**

United States District Court, D. Puerto Rico.

June 11, 1996.

---

1. See San Juan Star article regarding Judge Torruella's opinion in *United States v. Levy Cordero.*

Madeline Garcia–Rodriguez, Stuart A. Weinstein–Bacal, Indiano, Williams & Weinstein–Bacal, San Juan, PR, for Plaintiff.

Pedro J. Santa–Sanchez, Carla Garcia–Benitez, O'Neill & Borges, San Juan, PR, for Ford Motor Company.

Ivan R. Fernandez–Vallejo, Jesus E. Cuza, Goldman Antonetti & Cordova, San Juan, PR, for Overseas Military Etc.

### OPINION AND ORDER

FUSTE, District Judge.

Plaintiff, Cary R. Patterson, d/b/a Ford Military Auto Sales (Patterson), brought this action pursuant to 10 L.P.R.A. § 278–278d (1976 & Supp.1995) (Law 75), and the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–1225 (1988), claiming that codefendant, Ford Motor Company, breached its distributor agreement. Plaintiff also claims that codefendants, Overseas Military Sales Corporation and Military Car Sales, Inc., a/k/a Overseas Military Car Sales Group (Overseas Military Sales Group), tortiously interfered with plaintiff's distributor agreement with Ford Motor Company. Codefendant Ford Motor Company has filed a motion to dismiss pursuant to Fed.R.Civ.P. 12, claiming that plaintiff did not have a distribution agreement protected by Law 75. Codefendant Overseas Military Sales Group has also filed a motion to dismiss under Fed.R.Civ.P. 12, arguing that Overseas Military Sales Group has not tortiously interfered with the agreement between plaintiff and Ford Motor Company. Plaintiff filed an opposition to codefendants' request for summary dismissal. This opposition was followed by codefendant Ford Motor Company's reply. Having examined the parties' respective contentions, we treat the motions to dismiss as motions for summary judgment, find no genuine controversies of material fact, and **GRANT** movants' motions.

## I.

### Introduction

Since December 1988, Ford Motor Company has had an agreement with the United States Army and Air Force Exchange Service (AAFES) to sell Ford vehicles to qualified United States military customers. In addition, from January 1989, until December 1995, Ford Motor Company had a similar sales agreement with the United States Navy Resale and Services Support Office (NAVRESSO). *Docket Document No. 13, Exhs. 1, 2, 3, & 4.* These agreements aim to provide United States-manufactured products at a pre-determined, competitive price to qualifying military customers stationed overseas. *Id., Exh. 6, ¶ 3.*

On March 8, 1989, Ford Motor Company and Patterson agreed that, as provided in these agreements, Patterson would serve as a Ford Motor Company military sales representative at three military installations in Puerto Rico: Fort Buchanan, Roosevelt Roads, and Sabana Seca. *Id., Exh. 8, Attachments.* Although the agreement was binding for a one-year period, the parties agreed that "[the] Agreement may be terminated by either party at any time at will upon sixty (60) day prior written notice given to the other," and that the agreement was to be construed pursuant to Michigan law. *Id.* In February 1991, the parties extended the agreement until March 8, 1995, leaving in force all the terms and conditions of the 1989 agreement. *Id., Exh. 11.*

In 1994, Ford Motor Company conducted a worldwide market study of its military sales, and found military sales declining due to base closings. As a result of this study, Ford Motor Company decided to contract only one sales agent, Overseas Military Sales Group. *Id., Exh. 6.* In a letter dated February 15, 1995, Ford Motor Company notified Patterson that, effective May 1, 1995, Ford Motor

Company would transfer "the responsibility for all military and diplomatic sales to Overseas Military Sales Group." *Docket Document No. 2, Exh. D.* Because Ford Motor Company's agreement with Patterson was to expire on March 8, 1995, Ford agreed to extend the agreement until May 1, 1995. *Id., Exh. F.*

## II.

### Fed.R.Civ.P. 12 and 56 Standards

When a court considers matters outside the pleadings in deciding a motion to dismiss pursuant to Rule 12(b), the court must treat the motion as one for summary judgment. *Cooperativa de Ahorro y Crédito Aguada v. Kidder, Peabody & Co.,* 993 F.2d 269, 272 (1st Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995); *Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.,* 958 F.2d 15, 18 (1st Cir. 1992). Since we have considered extra-pleading material in disposing of the present case, we convert defendants' motions to dismiss into one for summary judgment.

In general, when treating a Rule 12 motion as a motion for summary judgment, the court must notify all parties of the conversion, in order to give them a reasonable opportunity to present all material pertinent to this type of motion. Fed.R.Civ.P. 12(b) and (c); *Chaparro–Febus v. International Longshoremen Ass'n, Local 1575,* 983 F.2d 325, 331 (1st Cir.1992). However, this court finds no need to mechanically enforce the requirement of express notice. *Id.* A district court does not have to give express notice when the opposing party has received movant's motion and materials and has had a reasonable opportunity to respond to them. *Id., citing, Moody v. Town of Weymouth,* 805 F.2d 30, 31 (1st Cir.1986). In the present case, plaintiff has treated the motions to dismiss as motions for summary judgment and has obtained and submitted additional evidentiary materials to rebut movants' motions. In fact, we convert codefendants' motions to dismiss into a summary judgment motion because we have precisely considered the extraneous material that plaintiff has appended to its opposition motion. Given these circumstances, we deem

proper our treatment of the motions as one for summary judgment.

A motion for summary judgment by a defendant should be granted if the pleadings, affidavits, and documents on file show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 894 (1st Cir.1988). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and "genuine", "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510. Under Fed.R.Civ.P. 56(e), the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

## III.

### Analysis

In its complaint, plaintiff pled five causes of action: (1) termination of a distributor agreement without just cause, (2) defamation, (3) tortious third-party interference with the distributor agreement, (4) violation of the Automobile Dealers' Day in Court Act, and (5) breach of contract. With the exception of the fourth claim, plaintiff's causes of action stem from alleged violations of Law 75. We will analyze the claims under Law 75 and the Automobile Dealers' Day in Court Act in turn.

### A. Law 75 Claim

One of the main reasons for the enactment of Law 75 is Puerto Rico's long-standing policy of promoting the formation and enforcement of dealership agreements. 10 L.P.R.A. § 278b–1. *DeMoss v. Kelly Services, Inc.,* 493 F.2d 1012, 1015 (1st Cir.1974); *Cobos Liccia v. DeJean Packing Company, Inc.,* 124 D.P.R. 896, 903 (1989). When re-

solving claims brought pursuant to Law 75, the court must look at the parties' interests and the law's public policy objectives.

Law 75 embodies the legislative intent to balance the bargaining power of the parties. The law also offers distributors necessary protection from arbitrary terminations, as well as protection from untoward practices on the part of principals or grantors. *See Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. at 85.

The law defines "Dealer" and "Dealer's Contract":

(a) Dealer: person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service;

(b) Dealer's contract: relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

10 L.P.R.A. § 278 (1976).

■ In *Roberco, Inc. v. Oxford Industries, Inc.*, 122 D.P.R. 115, 131–32 (1988), the Supreme Court of Puerto Rico provided a non-exhaustive list of factors to consider in determining whether or not an entity or person has achieved dealer status. In order to deem a person or entity a dealer, we should consider whether the person or entity (1) promotes and closes sales contracts; (2) keeps an inventory; (3) exercises control over prices; (4) has discretion regarding sale terms; (5) is responsible for the delivery of the merchandise and the collection of monies for the merchandise, or has the authority to extend credit; (6) is involved in the publicity of the product or service; (7) has assumed the risk and the responsibility of its undertakings; or (8) purchases the product, has physical facilities used to promote, sell or store the product, and offers services related to the product to customers. *Id.* at 131–32. No single factor is determinate nor is any factor entitled to more weight or importance than the others. *Id.* at 132. *See also A.M. Capens Co., Inc. v. American Trading and Production Corp.*, 892 F.Supp. 36 (D.P.R. 1995), *aff'd*, 74 F.3d 317 (1st Cir.1996).

The underlying public policy of the law is to prevent termination of a dealership agreement without just cause. *R.W. Intern. Corp. v. Welch Food, Inc.*, 13 F.3d 478, 481 (1st Cir.1994); *Luis Rosario, Inc. v. Amana Refrigeration, Inc.*, 733 F.2d 172 (1st Cir.1984); *Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *San Juan Mercantile Co. v. Canadian Transport Corp., Ltd.*, 108 D.P.R. 211 (1978). "Just cause" is defined as,

[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service.

10 L.P.R.A. § 278(d) (1976).

In deciding whether plaintiff's claims fall within the ambit of Law 75, this court must first determine the type of commercial relationship that exists amongst the parties involved in the instant case. *Cobos Liccia*, 124 D.P.R. at 903.

### 1. The relationship between Patterson and Ford Motor Company

■ Ford Motor Company's first contention is that Law 75 is inapplicable because the law's sweep does not extend to sales activities within federal military installations to federal military customers. Without deciding the exact breadth of Law 75, we find that Patterson is not a dealer under Law 75.

Pursuant to the agreements between Ford Motor Company and AAFES, and between Ford Motor Company and NAVRESSO, Ford Motor Company can contract sales representatives to initiate orders for Ford vehicles at certain United States military installations. *Docket Document No. 13, Exh. 6, ¶ 7.* Ford Motor Company contracted military sales representatives throughout the world.

*Id.* However, any military sales representative agreement is subject to the provisions of Ford Motor Company's military sales agreement with AAFES and NAVRESSO. *Id., Exh. 8.* That is, as Ford Motor Company points out, Patterson's rights and obligations were connected with the underlying agreements between Ford Motor Company and the military departments.

Ford Motor Company independently contracted Patterson to serve as a military sales representative in Puerto Rico. *Id.* Patterson agreed to comply with all the terms and conditions set forth in the agreements between Ford Motor Company, AAFES, and NAVRESSO. *Id.* Patterson also agreed that its employees would comply with all the rules and regulations specified by the Ford Motor Company, AAFES and NAVRESSO agreements. *Id.*

Patterson's sale activities of Ford vehicles in Puerto Rico were limited to three exchange posts, to wit, Fort Buchanan, Roosevelt Roads, and Sabana Seca, from which Patterson sold cars only to qualifying United States military exchange customers. *Id., Exh. 8.* Patterson did not sell Ford vehicles to the general public from different locations. In return for a fixed fee paid by Ford Motor Company, AAFES and NAVRESSO allocated office space and show-car display areas. *Id., Exh. 6,* ¶¶ *5 & 6.* AAFES and NAVRESSO also provided telephone installations and other utilities. *Id.* Patterson had only to purchase office furniture and a fax machine. *Id.* Pursuant to the Military Sales Representative Agreement, Ford Motor Company had to supply promotional material to Patterson. *Id., Exh. 8, Sec. 3.* Additionally, at the end of the calendar year, Patterson was reimbursed for any advertising expenses from the $10–15,000 annual advertising budget. *Id., Exh. 6,* ¶ *14.*

Essentially, Patterson procured orders from military customers, sent these orders to Ford Motor Company for approval, and received a commission in return. *Id., Exhs. 5, 6, 8, & 10.* The "Military Exchange Sales Order" form used for each sale already established the terms and conditions of the sale, and every sale was an agreement only between Ford Motor Company and the customer. *Id., Exh. 5.* Although Patterson assisted military customers in obtaining credit, it was not required to extend any credit to customers. Customers would obtain credit through financial institutions. *Docket Document No. 18, Exh. A,* ¶ *8.* Ford generally required proof of retail financing and a deposit in order to sell a vehicle to a customer. *Id., Exh. 6,* ¶ *9.*

AAFES and NAVRESSO limited sale price to 6–7% above United States dealer invoice price. *Id., Exh. 6.* In addition, Ford Motor Company set the minimum sales price by which Patterson could sell Ford vehicles. *Docket Document No. 18, p. 7.* Although Patterson had certain discretion regarding sales prices, Patterson still faced these upper and lower price limits.

Patterson did not have to maintain an automobile service facility, a parts inventory, or a showroom. *Docket Document No. 13, Exh. 6,* ¶ *11.* Autos Vega, an authorized Ford Motor Company dealer, prepared new vehicles for customer delivery, and also extended to military sales customers warranty consistent with Ford Motor Company's warranty policy for the average retail customer. *Docket Document No. 2, Exh. A, Attachment 10; Docket Document No. 18, Exh. A,* ¶ *3.* Pursuant to the AAFES and NAVRESSO agreements, only Ford's authorized dealers, like Autos Vega, would make warranty repairs free of charge. *Docket Document No. 7, Exh. 1 (Exh. E* ¶ *11); Exh. 2, p. 22,* ¶ *11(b)(3).* In addition, Autos Vega was the military sales delivery dealer [1] for Ford in Puerto Rico. *Docket Document No. 2, Exh. A, Attachment 10; Docket Document No. 18, Exh. A,* ¶ *3.*

For its part, Patterson claims that it made significant capital investments in inventory and equipment. Inventory consisted of annual demos and cars not resold after a canceled sale that Patterson was required to buy if such vehicles had not been sold by the end of the calendar year. Patterson alleges that

---

1. Cars were delivered to Autos Vega, where they were prepared for customer pick-up. *Docket Document No. 18, Exh. A,* ¶ *3.*

it made $200,000 worth of such annual vehicle purchases. Patterson also claims to have invested in office repairs and equipment, such as a trailer and an air-conditioning unit. *Docket Document No. 2, Exh. A, Attachments 2 and 8.*

Ford Motor Company explains that it made yearly deliveries of model vehicles to Patterson for display purposes. Ford did not require Patterson to purchase these display models unless they remained unsold at year's end. *Docket Document No. 13, Exh. 6, ¶ 12.* These unsold cars were few, and the sale of these cars constituted only a small percent of Patterson's total sales. *See, e.g., Docket Document No. 13, Exhs. 7 & 12.* From 1992 to 1994, Patterson had to purchase only one such demonstration vehicle. *Docket Document No. 20, Exh. D.* Ford Motor Company did not require Patterson to maintain an inventory. *Docket Document No. 13, Exh. 6, ¶ 12.* We find that these limited purchases do not constitute an inventory for purposes of Law 75. Patterson did not purchase cars from Ford Motor Company, and then warehouse them for resale to its customers. Patterson purchased these cars only after the calendar year term arrived without a sale. We also note that under contract, Autos Vega had to supply Patterson with vehicles for auto shows on military installations. *Docket Document No. 20, Exh. C, ¶ 4.* We also find that money spent on equipment and repairs were necessary to establish and maintain Patterson's office in Puerto Rico. *See Morales v. Gregg Shirt Makers, Inc.,* 682 F.Supp. 142 (D.P.R.1988) (sales representative is not to be deemed a dealer only because it incurs in office space and payroll expenses).

Patterson also alleges that it bore the financial risks of a typical dealer. For instance, Patterson claims that it had to pay excise taxes. *Docket Document No. 2, Exh. A, Attachment 5.* Although Patterson had to pay excise taxes before receiving the cars, Patterson passed these taxes to purchasers upon sale. The customer had to pay for any excise taxes. As another example, Patterson claims that it absorbed the costs of legal fees and reimbursement to Ford for the embezzlement committed by a former employee. *Id., Attachment 7.* However, these are typical costs of any business, not expenses particular to dealerships.

Lastly, Patterson also claims to have had discretion regarding sale terms and car prices, *Id., Attachments 5, 6, 9 & 10,* and to have provided service arrangements for customers. *Id., Attachment 10.* Allegedly, Patterson was afforded considerable discretion in authorizing rebates. *Id., Attachment 5.* However, this authorization comported with the AAFES and NAVRESSO agreements, which specifically provided for Ford Motor Company to apply any rebate or discount that could be applied to the price of a customer order. *Docket Document No. 13, Exh. 1, (Exh. C, ¶ 5(d)); Exh. 4, p. 7, ¶ 5(c).*

In sum, even considering the facts in the manner most favorable to plaintiff, Patterson has not disputed its lack of authority to approve the orders it dispatched to Ford Motor Company. It has not controverted the fact that Ford Motor Company determined sales terms and conditions. Instead, Patterson was a sales representative on commission for sales made exclusively to military exchange customers at military installations. Plaintiff was not an independent entrepreneur, effectively in charge of closing sales. Patterson's relationship with Ford Motor Company possessed a hierarchical subordination quality. *J. Soler Motors v. Kaiser Jeep Int'l. Corp.,* 8 P.R.R. 138 (1978) (Official Translations). Since Patterson is not a distributor as defined by Law 75, it cannot be afforded any remedy under that law.

**B. *Automobile Dealers' Day in Court Act Claim***

■ The Automobile Dealer's Day in Court Act creates a cause of action in favor of a franchised automobile dealer against an automobile manufacturer for damages sustained

> "[b]y reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer...."

15 U.S.C. § 1222 (1988). "Good faith" is defined as

[t]he duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

A *sine qua non* element of a cause of action under the Act is the existence of a manufacturer-dealer relationship. *Maschio v. Prestige Motors,* 37 F.3d 908, 910 (3rd Cir.1994); *Stansifer v. Chrysler Motors Corp.,* 487 F.2d 59 (9th Cir.1973). The Act provides us with broad definitions for the terms "automobile manufacturer" and "automobile dealer." *See* 15 U.S.C. § 1221. An automobile manufacturer is "any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons ..." 15 U.S.C. § 1221(a). And an automobile dealer is

[a]ny person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons.

15 U.S.C. § 1221(c).

It is clear that Ford Motor Company is an automobile manufacturer under the Act. However, we believe that Patterson is not an automobile dealer within the meaning of the Act. We have found no case in which the term "automobile dealer" has been extended to include commissioned sales representatives like Patterson. Additionally, a perusal of the case law interpreting the Act indicates that an automobile dealer is one that purchases products from the manufacturer for resale; has a showroom to display the product; has warehouse facilities to store the products; maintains an inventory; sells parts and accessories, which are also stored and inventoried; and offers services to customers

related to the products it sells. *See, e.g., H.D. Corp. of Puerto Rico v. Ford Motor Co.,* 791 F.2d 987 (1st Cir.1986); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049 (1st Cir.1985); *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); *Imperial Motors, Inc. v. Chrysler Corp.,* 559 F.Supp. 1312 (D.C.Mass.1983). As we have already discussed, Patterson did not purchase products and store them for future sales, and offered no Ford product services to military customers.

 We also find that Ford Motor Company acted in good faith when it terminated its sales representative agreement with Patterson. We first note that the First Circuit Court of Appeals has restrictively interpreted the standard of "good faith". *See General GMC, Inc. v. Volvo White Truck Corp.,* 918 F.2d 306 (1st Cir.1990); *H.D. Corp. of Puerto Rico v. Ford Motor Co.,* 791 F.2d 987 (1st Cir.1986); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049 (1st Cir.1985). In order for Patterson to prevail, it must prove that the alleged misconduct rises to the level of coercion or intimidation. *Id.* at 1056. The coercion or intimidation must be actual; the mere fact that a dealer feels coerced or intimidated is not enough. *Id.* Coercion or intimidation consists of two elements: wrongful demand coupled with the imposition or threat of imposition of sanctions if the dealer does not comply with the wrongful demand. *Id.*

Plaintiff in the instant matter alleges that Ford Motor Company did not act in good faith in terminating the sales representative agreement. It specifically alleges that in a letter dated April 11, 1995, Ford Motor Company gave Patterson the option of obtaining a lump sum commission payment instead of the normal, agreed payment method (on a monthly basis when the vehicles are actually delivered), in exchange for Patterson signing a document releasing Ford Motor Company from any liability arising out of or in connection to the sales representative agreement between the parties. *Docket Document No. 1, ¶ 40.* According to plaintiff, this letter has a coercive and intimidating effect because it threatens to hold plaintiff's dealer commissions for undelivered auto sales and plain-

tiff's fourth quarter 1994 sale bonus hostage to (1) a waiver of plaintiff's legal rights against Ford Motor Company for unjustly terminating the sales representative agreement, and (2) participation in Overseas Military Sales Group. *Id.,* ¶ *44.*[2] Finally, plaintiff speculates that, once Overseas Military Sales Group takes over the Puerto Rico military sales market, it will cancel or rewrite sales made by Patterson prior to May 1, 1995, or prevent deliveries to Patterson's military customers. *Id.,* ¶¶ *41 & 42.*

Plaintiff has not supported its allegation of coercion and intimidation. The record lacks any evidence of wrongful demand coupled with the use of coercive conduct. Patterson has not proved that its termination was caused by its failure to yield to any wrongful demand made by Ford Motor Company under threat of sanctions in the case of noncompliance. Indeed, in the April 11th letter, Patterson was advised that, if it chose not to sign the satisfaction and release form and receive the lump-sum commission payment, its commissions would continue to be paid on a monthly basis. Ford Motor Company never threatened to impose any type of sanction if Patterson did not sign the release.

In the absence of conduct constituting coercion or intimidation, there can be no recovery under the Act. Since plaintiff has failed to allege and support allegations of coercive conduct in the termination of the military auto sales representative agreement, codefendants are entitled to judgment on cause of action number five as a matter of law.

### IV.

#### *Conclusion*

In sum, plaintiff's claim does not fall within the ambit of Law 75 because plaintiff was never a "dealer" as that term is defined under that law. Plaintiff was a sales representative on commission selling Ford cars only to qualified military customers. Accordingly, we summarily dismiss all of plaintiff's claims brought pursuant to Law 75.

Likewise, we dismiss plaintiff's claim under the Automobile Dealer's Day in Court Act. Plaintiff has not shown to this court that there was any coercion or intimidation involved in the termination of its sales representative agreement with Ford Motor Company. Ford Motor Company terminated its sales representative agreement with Patterson because it was more efficient and economical to serve its military customers through one worldwide sales representative, Overseas Military Sales Group. Upon termination, Ford Motor Company offered Patterson the option either to receive its commission in a lump sum or to continue receiving the agreed upon monthly commission payment. Ford Motor Company never coerced or threatened Patterson to choose one alternative over the other, and Patterson never experienced any harm as the result of its selection.

**IT IS SO ORDERED.**

---

2. It appears that plaintiff bases this allegation on the language of the "Satisfaction and Release" section of the April 11th letter, which provides as follows:

> I acknowledge that I have chosen the option to receive a lump sum commission payment equal to my current commission calculation for total number of firm orders (orders for 1995 Ford vehicles accompanied by a $300 deposit and proof of financing) that I have submitted as of May 1, 1995, including pay for performance bonus, if applicable, for the fourth quarter of 1994, less the average cancellation rate (computed by averaging the number of cancellations received on orders that I submitted to Ford Motor Company during the 1993 and 1994 model years).

*Docket Document No. 1,* ¶ *40.*